William B. LARKIN; Louise Seals, as personal representative of Spurgeon Seals, deceased; Lillie Lofton, as personal representative of Edward Lofton, deceased; Jesse B. Terry, on behalf of himself and others similarly situated, Plaintiffs-Appellants,

v.

PULLMAN–STANDARD DIVISION, PULLMAN, INC., a corporation, Defendant-Appellee.

Louis SWINT and Willie James Johnson, on behalf of themselves and others similarly situated; Clyde Humphrey, Plaintiffs-Appellants,

v.

PULLMAN–STANDARD, Bessemer, Alabama; United Steelworkers of America Local 1466; and United Steelworkers of America, AFL–CIO, International Association of Machinists, Defendants-Appellees.

Louis SWINT, and Willie James Johnson, on behalf of themselves and others similarly situated; Clyde Humphrey, Plaintiffs-Appellees,

v.

PULLMAN–STANDARD, Bessemer, Alabama, Defendant-Appellant,

United Steelworkers of America Local 1466; and United Steelworkers of America, AFL–CIO, International Association of Machinists, Defendants.

Nos. 84–7319, 86–7886 and 87–7057.

United States Court of Appeals, Eleventh Circuit.

Sept. 21, 1988.

1550

O. William Adams, III, Birmingham, Ala., Elaine R. Jones, Washington, D.C., James U. Blacksher, Birmingham, Ala., Eric Schnapper, NAACP Legal Defense Fund, New York City, for plaintiffs-appellants in No. 84–7319.

C.V. Stelzenmuller, Burr & Forman, Birmingham, Ala., for defendant-appellee in No. 84–7319.

James U. Blacksher, Mobile, Ala., Oscar W. Adams, III, Birmingham, Ala., Elaine R. Jones, NAACP Legal Defense & Educational Fund, Washington, D.C., Julius L. Chambers, Pamela S. Karlan, Eric Schnapper, NAACP Legal Defense Fund, New York City, for plaintiffs-appellants in No. 86–7886.

Jerome A. Cooper, Cooper, Mitch & Crawford, Birmingham, Ala., for defendants-appellees in No. 86–7886.

C.V. Stelzenmuller, Burr & Forman, Birmingham, Ala., for defendant-appellant in No. 87–7057.

Before JOHNSON and CLARK, Circuit Judges, and DUMBAULD *, Senior District Judge.

* Honorable Edward Dumbauld, Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

CLARK, Circuit Judge:

Few cases better represent the idea that the road to justice can be a long and tortured one. The class action giving rise to two of these three consolidated appeals was filed in 1971. The named plaintiffs, Louis Swint and Willie Johnson (the *"Swint* plaintiffs"), alleged that Pullman-Standard, Inc. (Pullman), the United Steelworkers, and United Steelworkers Local 1466 (collectively USW) had engaged in a number of racially discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (1982),[1] and 42 U.S.C. § 1981 (1982).[2] Since the complaint was filed, many members of the plaintiff class have died, and our consideration of the case marks its fourth appearance before this court. Both sides have appealed certain aspects of the district court's decision.

A related suit, from which the remaining appeal arises, was filed in 1975. The plaintiffs in that suit—William Larkin, Spurgeon Seals, Edward Lofton, and Jesse Terry (the *"Larkin* plaintiffs")—brought similar charges against Pullman, and our consideration of their case marks its second appearance here. The *Larkin* plaintiffs appeal a separate district court's decision in favor of Pullman.

Regretting that we cannot resolve the case in its entirety, we affirm in part and reverse in part the *Swint* district court decision, and affirm the *Larkin* district court decision.

## TABLE OF CONTENTS

I. The Factual Background ............................................. 1554
 A. *Assignments and Promotions* ..................................... 1554
 B. *Selection of Supervisors* ....................................... 1555
II. The Litigation ................................................... 1555
 A. *The EEOC Proceedings* ........................................... 1555
 B. *The Swint Case* ................................................. 1556
 C. *The Larkin Case* ................................................ 1560
III. The Liability Period ............................................ 1561
 A. *Dating the Title VII Claims* .................................... 1561
 B. *Dating the Section 1981 Claims* ................................. 1567
IV. Departmental Assignments ......................................... 1570
 A. *Departmental Assignments as an Independent Issue* ............... 1571
 B. *Swint's Representation of the Class on the Issue of Discriminatory*
 *Assignments* .................................................... 1572
 C. *The Date on Which Discriminatory Assignments Ceased* ........... 1573
V. The Nontransferable Seniority System ............................. 1575
VI. The Selection of Supervisors .................................... 1579
VII. The *Larkin* Appeal ............................................. 1583
VIII. Conclusion .................................................... 1584

**1.** Title VII provides that

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (1982).

**2.** Section 1981 provides that

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

## I. The Factual Background

Both the *Swint* and *Larkin* lawsuits challenge employment practices at Pullman's Bessemer, Alabama plant before it closed in 1980. Employees at the plant during the general[3] time frame covered by the complaints were drawn from twenty-eight departments, each department covering roughly a particular phase of Pullman's manufacture of railroad cars. Pursuant to collective bargaining agreements with the two unions, two of the departments were represented by the International Association of Machinists (IAM); and the remaining twenty-six by USW.[4] The agreements were different, but they had one important provision in common: seniority, the primary factor upon which promotions were based, was not transferable between the various departments,[5] at least prior to 1972.[6] If an employee transferred to another department, he[7] lost his seniority.

### A. Assignments and Promotions

There is little dispute that, prior to 1965, there were both segregated departments and mixed-race departments. Four USW departments—Die & Tool, Janitor, Steel Miscellaneous, and Truck—were all black. Five USW departments—Air Brake, Inspection, Plant Protection, Powerhouse, and Template—and the two IAM departments—Die & Tool and Maintenance—were all white.[8] There were also, within each mixed-race department, "white" jobs and "black" jobs, meaning that when a particular job was vacated, it was necessarily filled with an employee of the same race. The "white" jobs tended to be the higher-paying, and the "black" jobs the lower-paying. Within the USW departments, in addition to the racial division of job assignments, there were specific pay-skill levels, each represented by a job class (JC) number. The JC number reflected the highest level of skill at which an employee had demonstrated he could work, and it determined what the employee's base pay would be.

Both before and after 1965, when a person was hired, he was assigned to both a department and a particular job. The job assignment would set the employee's JC level. Under the collective bargaining agreement, promotions to higher JC-level jobs were to be awarded on the basis of seniority (which in effect meant they were intradepartmental only), provided that the employee could actually perform the work and that the position was not filled from the outside. The highest JC level an employee could achieve within his department varied with the department. In the all-black departments, the maximum JC level varied from 1–9; in the mixed-race departments, the maximum varied from 8–18; and in the all-white departments, the maxi-

3. It is necessary to refer to the general time period because, as will become apparent later, the time period covered by the complaints is very much at issue.

4. Because IAM was not named in any of the EEOC charges or in Swint's complaint, the union is in the case as a defendant only to the extent that some of the relief sought by the plaintiffs might entail modification of its contract with Pullman. For this reason, any further references to "the union" will be to USW unless otherwise specifically noted.

5. USW's agreement provided that seniority meant continuous service in a single department. IAM's seniority system was even more restricted. Seniority meant continuous service in the same type of *job,* i.e., millwrights got credit only for the time they had been millwrights. Because the agreements differed with respect to what constituted seniority, we shall refer to Pullman's overall seniority system as "nontransferable" rather than "departmental."

6. Pullman entered into an agreement with the Department of Labor's Office of Federal Contract Compliance in 1972 that permitted certain blacks to transfer to certain other departments without losing their seniority. *See infra* part I.A.

7. There were twenty or so women working at the Bessemer plant in the late sixties-early seventies. However, because the workforce was predominantly male, and to prevent the reader's distraction, the masculine gender of pronouns will be used in this opinion.

8. Although the two unions' reasons for doing so are disputed, it is not disputed that agreements between IAM and USW's predecessor, the Steel Workers Organizing Committee (SWOC), in the 1940's resulted in IAM trading its twenty-four black members for two of SWOC's white members.

mum varied from 8–20.[9] Vacancies were not announced or posted. Pullman supervisors would choose the employee to fill the position or make the determination to hire from the outside.

In 1965, after an arbitration decision had opened up the previously all-white riveter job to blacks, some changes began to take place. The system of nontransferable seniority and promotions remained in place,[10] but a reporting system of hires and promotions was developed, and Pullman expressed its desire to recruit blacks for the highly-skilled positions. Unfortunately, at the same time, Pullman terminated its practice of offering on-the-job training and began to require that employees wanting to move to a higher skill level demonstrate that they had formal outside training or experience.

In January 1969, Pullman entered a conditional memorandum of understanding with the Department of Labor's Office of Federal Contract Compliance (OFCC) that it would encourage blacks to move from "low-ceiling" departments (where the highest JC level available was still quite low) to higher-ceiling ones. Pullman also agreed to offer at the company's expense, and encourage black employees to take part in, a program of outside vocational education. The memorandum, however, did not officially become effective because the union did not approve it. In May 1972, Pullman entered another agreement with OFCC that allowed blacks who were hired into the four traditionally black departments prior to April 30, 1965 to transfer into any department without losing their seniority. Additionally, any black whatsoever hired prior to April 30, 1965 was permitted to transfer to one of the five traditionally white departments without losing his se-

niority. The transfers, of course, were dependent on there being a vacancy in the department to which an employee wished to transfer. Seventeen blacks used this agreement to transfer, though it, like the 1969 memorandum, was not formally adopted by the unions.

### B. Selection of Supervisors

The selection of supervisors, both before and after 1965, was not based on seniority. There were four levels of supervisors: "hourly foremen," who alternated between regular and supervisory work; "A foremen," the lowest-level salaried employees; "B foremen"; and Department Heads. These positions were considered within Pullman's (rather than USW's) purview. The B foremen would select the hourly and A foremen, and the Department Head would select the B foremen. The selections were based on the relevant supervisor's subjective evaluations of the employees, which were in turn based on what Pullman calls "objective" criteria, such as the ability to get along with other employees and knowledge of the particular department's operations. Foremen were not necessarily drawn from the department they would ultimately supervise.

### II. The Litigation

### A. The EEOC Proceedings

After Title VII became effective in June of 1965, the Equal Employment Opportunity Commission (EEOC) received several charges complaining that Pullman had engaged in racially discriminatory employment practices. Five of these charges are relevant here. On November 4, 1966,[11] Spurgeon Seals, a *Larkin* plaintiff, filed a charge alleging that he had been passed over for a better paying job in spite of his

---

**9.** These JC level figures refer exclusively to the USW departments.

**10.** As will be discussed in more detail later, *see infra* part V, the parties dispute whether the practice of reserving certain intradepartmental jobs for whites and others for blacks continued after 1965.

**11.** There is some confusion about this date. The copy of the charge that appears in the

record indicates that it was signed October 30, 1966, but there is no indication of the filing date. Because documents filed by Pullman with the EEOC argue that the charge was filed on November 4, and, at least at one point, the plaintiffs' brief so indicates, we will assume that November 4 is the actual filing date. In any event, our disposition of this charge renders any dispute over the date insignificant. *See infra* note 32.

seniority. On March 27, 1967, EEOC Commissioner Stephen Shulman filed a charge alleging that Pullman discriminated against blacks in its hiring and promotional practices. On April 11, 1967, Spurgeon Seals, Edward Lofton and Jesse Terry filed a document that they styled an "amendment" to Seals' 1966 charge. To Seals' specific complaint that he was passed over, they added allegations that white employees in their department were (1) disproportionately assigned to those jobs that would lead to the higher-paying positions, (2) disproportionately selected for temporary assignments that would prove an employee's ability to perform in a higher position, and (3) given the easier and cleaner work. On October 13, 1967, William Larkin filed a charge alleging that Pullman discriminated in its hiring and promotional practices. Finally, on October 15, 1969, Louis Swint filed a charge alleging that Pullman discriminated in its training and promotional practices.[12]

The EEOC consolidated all of the charges other than Swint's, and on April 26, 1972, issued its decision. The Commission concluded that there was reasonable cause to believe that Pullman had discriminated in "hiring, promotion, job assignments, terms and conditions of employment and the operation of an unlawful seniority system." Swint's charge appears not to have been similarly resolved. On September 22, 1971, before disposing of the case and at the request of Swint's attorney, the Commission issued Swint a letter advising him that he could institute a civil action within thirty days.

*B. The Swint Case*

Swint did so, seeking injunctive, declaratory, and monetary relief on behalf of himself and all other similarly situated black Pullman employees. His complaint, as amended, alleged that Pullman and USW

(to the extent that the latter participated in a particular practice or was a party to a discriminatory practice because it was embodied in the collective bargaining agreement) had practiced racial discrimination in hiring, training, temporary assignments, promotions, and the maintenance of the seniority system.[13] On June 4, 1974, in an order following the second pretrial conference, the district court certified the class Swint sought to represent:

> [T]he court finds and concludes that the prerequisites of Rule 23(a) and Rule 23(b)(2) are satisfied and that this action may hereafter be maintained on behalf of all black persons who are now or have (within one year prior to the filing of any charges under Title VII) been employed by defendant Company as production or maintenance employees represented by the United Steelworkers.

Record, Vol. II, Tab 18 at 1. According to the court, the parties had "made known certain facts to the court and ... agreed that such facts may be considered by the court without formal hearing otherwise required under Rule 23." *Id.*

After sixteen days of trial testimony and the submission of numerous exhibits, the district court concluded that the plaintiffs had not proven that the seniority system of promotions was unlawful or that the selection of supervisors was discriminatory. *See Swint v. Pullman-Standard (Swint I)*, 11 F.E.P. 943, 954, 959 (N.D.Ala.1974) [available on WESTLAW, 1974 WL 262]. However, in the course of its discussion of the seniority system, the court found that, insofar as Pullman had maintained some single-race departments, it had discriminated in its assignments of new employees until as late as 1972. *See id.* at 953–54. The district court held that the proper remedy for this discrimination was to expand

---

**12.** This summary of the EEOC charges does not include any claim that the parties have agreed are no longer in the case, e.g., the claims that Pullman physicians maintained racially segregated facilities. Nor does it include later charges filed by Swint, because those charges are not relevant to the issues before the court.

**13.** As with the summary of the EEOC charges, this summary of Swint's allegations omits certain allegations that have no bearing on the issues before the court.

the transfer eligibility made available by the OFCC agreement.[14] *See id.* at 954.

On appeal, this court reversed the district court's conclusions on the seniority system and the selection of supervisors. *See Swint v. Pullman-Standard (Swint II),* 539 F.2d 77, 93, 104 (5th Cir.1976). With respect to the seniority system, the court found that the district court had erroneously required the plaintiffs to prove that the discriminatory initial assignments caused classwide economic harm. *See id.* at 93. Segregation in and of itself, the court held, constituted discrimination in violation of Title VII, and if the seniority system perpetuated such discrimination,[15] it, and promotions pursuant to it, also would violate Title VII. *See id.* at 91. With respect to the selection of supervisors, the court found that two of the four grounds for the district court's decision were invalid.[16] *See id.* at 104. The case was remanded for whatever proceedings the district court felt were "appropriate or necessary" to comply with the opinion. *Id.* at 105.

On remand, a two-day hearing was held, at which additional evidence and briefs were submitted. While the district court was considering its decision, the Supreme Court issued its decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Court rejected what had become this circuit's standard approach to seniority systems. *See, e.g.,*

*United States v. T.I.M.E.-D.C.,* 517 F.2d 299, 320 (5th Cir.1975) (collecting cases), *rev'd sub nom. International Brotherhood of Teamsters v. United States,* 431 U.S. at 324, 97 S.Ct. at 1843; *Local 189, United Papermakers & Paperworkers v. United States,* 416 F.2d 980, 987–88 (5th Cir.1969), *cert. denied,* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). Plaintiffs could not prevail, the Court held, simply by showing that a seniority system perpetuated the effects of pre-Title VII discrimination. *See Teamsters,* 431 U.S. at 353–54, 97 S.Ct. at 1864. To overcome the bona fide seniority system exception, *see* 42 U.S.C. § 2000e–2(h) (1982), plaintiffs had to show that a seniority system was established or maintained with discriminatory intent. *See Teamsters,* 431 U.S. at 356, 97 S.Ct. at 1865; *see also Trans World Airlines v. Hardison,* 432 U.S. 63, 82, 97 S.Ct. 2264, 2275, 53 L.Ed.2d 113 (1977).

Relying on *Teamsters,* the district court again held for Pullman on the promotions issue. *See Swint v. Pullman-Standard (Swint III),* 15 F.E.P. 144, 147 (N.D.Ala. 1977) [available on WESTLAW, 1977 WL 888]. Realizing that it would have to focus on post-Act discrimination, the court assumed that the liability period should be dated from December 27, 1966: "To give plaintiffs' [sic] the benefit of the doubt, the court has in this opinion used the earliest possible date, i.e., 90 days before the March

---

14. As noted above, the OFCC agreement provided that any black hired prior to April 30, 1965 and assigned to one of four all-black departments could transfer to any department without losing his seniority. The district court directed Pullman to set the eligibility dates (dates of employment) later with respect to three of the four black departments, so that the eligibility dates would correspond with the date on which discriminatory assignments to each of those three departments ended. The OFCC agreement also provided that any black employee hired prior to April 30, 1965 could transfer to one of the four all-white departments without losing his seniority. The district court directed Pullman to again move the eligibility dates later insofar as a black employee wanted to transfer to one of three departments that remained all white until well after 1965.

15. *Swint II* was decided prior to the Supreme Court's decision in *International Brotherhood of*

*Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As will be discussed, *Teamsters* reversed this circuit's holdings that any seniority system that perpetuated past discrimination could not be bona fide and thus protected under 42 U.S.C. § 2000e–2(h) (1982).

16. The court held that the district court should not have treated literacy as the explanation for the racial discrepancy unless it had been proven a business necessity. The court also rejected the district court's reliance on his conclusion that pre–1965 discrimination had prevented blacks from gaining the skill and experience they needed to be able to supervise. That justification would have been valid, the court held, only if Pullman had shown that the skills were a business necessity and that blacks did in fact lack them. *See Swint II,* 539 F.2d at 104.

27, 1967 Commissioner's charge, while nevertheless having substantial reservations that such a date is proper." *Id.* at 146 n. 5. It then found that by December 1966 the company was no longer making assignments to departments based on race. The court acknowledged that this finding conflicted with its findings in *Swint I*, but concluded that its original decision, "based largely upon a mechanical application of statistical data respecting a few departments, was incorrect." *Id.* at 149. The court also held that Pullman had not discriminated in its selection of supervisors. The court's calculations revealed no statistically significant disparity in the number of blacks and whites chosen,[17] and, in any event, Pullman had demonstrated that experience as a temporary foreman—which, due to *pre-Act* discrimination blacks were less likely to have—was a bona fide occupational qualification. *See id.* at 150–52.

The plaintiffs filed a motion to amend the judgment with respect to the court's language on the date from which Pullman's liability was measured. They argued that the liability period should have been backdated from the Commissioner's charge 180 rather than 90 days, due to a 1972 amendment to Title VII that extended the time for filing. The court wrote that "[p]laintiffs are probably correct," but found that even if a September date were used, its finding that Pullman had not discriminated during the liability period would stand. *Swint v. Pullman-Standard (Swint IV)*, 15 F.E.P. 1638, 1639 (N.D.Ala.1977) [available on WESTLAW, 1977 WL 40]. The plaintiffs also asked for a new trial on the seniority system on the ground that they had proceeded to trial on an accepted theory that *Teamsters* reversed. The court granted that motion. *See id.* at 1640.

The evidence presented at the third trial did not alter the district court's conclusion. Operating under the four-factor framework this court had set forth (after *Teamsters*) in *James v. Stockham Valve & Fittings*

Co., 559 F.2d 310 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed. 2d 781 (1978), the court held that three of the factors as well as the totality of the circumstances indicated that the seniority system did not reflect an intent to discriminate. *See Swint v. Pullman-Standard (Swint V)*, 17 F.E.P. 730, 739 (N.D.Ala. 1978) [available on WESTLAW, 1978 WL 115]. The court was unimpressed with the plaintiffs' showing that blacks appeared to be locked into the least economically desirable departments, asserting that this court had precluded any consideration of economic unfairness:

> [T]he rationale of the Fifth Circuit in Pullman-Standard II indicates that such a study of relative economic desirability would be inappropriate. If one is to measure inequality without reference to economic desirability, it would seem logical to measure its opposite—equality or neutrality—without reference to such desirability.

*Id.* at 734.

On appeal, this court reversed and remanded "for proceedings necessary to render appropriate relief." *Swint v. Pullman-Standard (Swint VI)*, 624 F.2d 525, 526 (5th Cir.1980). In independent sections of its opinion, the court held that Pullman had violated Title VII in its assignments to departments, its system of nontransferable seniority, and its selection of supervisors. With respect to departmental assignments, the court cited several numerical mistakes in the district court's calculations and concluded that the district court's ruling was "factually unsubstantiated." *See id.* at 529. With respect to the seniority system, the court found several errors in the district court's analysis. First, the district court had been unreasonable in construing *Swint II* to preclude any consideration of the fact that blacks were relegated to the economically undesirable departments; *Swint II* merely held that discrimination could take a non-economic form as well as

---

**17.** The court found that "the number of blacks appointed to salaried supervisory positions is less than two standard deviations from the number expected from the composition of temporary foremen." *Swint III*, 15 F.E.P. at 151. The court acknowledged that there was a disparity of "some 2.54 standard deviations" in the Welding department, by far the largest department at the plant.

an economic one. *See id.* at 530–31. Second, the district court had no basis on which to find the seniority system rational: "[n]o credible explanation has been advanced to sufficiently justify the separate seniority units." *Id.* at 531, 533. Third, the district court improperly rejected any consideration of IAM's role in the creation of nontransferable seniority, given IAM's undisputed past efforts to exclude blacks from its bargaining units. *Id.; see supra* note 8. On the last issue, the selection of supervisors, the court found that Pullman had failed to show that requiring salaried supervisors to come from the ranks of the temporary supervisors was a business necessity. The court noted further that Pullman had not articulated any particular skills necessary to performing as either a temporary or salaried supervisor.[18] *See Swint VI,* 624 F.2d at 535–36.

The Supreme Court granted certiorari to consider the seniority system issue and reversed. *See Pullman–Standard v. Swint (Swint VII),* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). The majority held that this court, despite stating that it was applying a clearly erroneous standard to the district court's finding of no intentional discrimination, had improperly weighed the evidence and entered factual findings of its own. The proper procedure would have been to review the record only for clear error and then remand to the district court for reconsideration. *Id.* at 292, 102 S.Ct. at 1792. The Court did not specify the aspects of *Swint VI* that it considered fact-finding.

The opinion remanding the case to the district court directed it to conduct whatever proceedings it felt necessary to comply with *Swint VI* and *Swint VII* and "to determine what impact the 'locking-in' of blacks to the least remunerative departments had on discouraging transfer between seniority units, and the significance of the discriminatory motivation of IAM with respect to the institution of USW's seniority system." *Swint v. Pullman-Standard (Swint VIII),* 692 F.2d 1031, 1031–32 (5th Cir.1982). A fourth trial was held, and the district court entered the decisions that gave rise to two of these appeals. *See Swint v. Pullman-Standard (Swint IX),* No. CV71–P–0955–S, slip op. (N.D.Ala. Sept. 8, 1986), Record, Vol. II, Tab 133; *Swint v. Pullman-Standard (Swint X),* No. CV71–P–0955–S, slip op. (N.D.Ala. Nov. 26, 1986), Record, Vol. II, Tab 136. Without discussion, the court concluded that it was bound by *Swint VI* to find Pullman liable for discriminating both in its departmental assignments and in its selection of supervisors. *Swint IX,* slip op. at 8, 11. The court rejected Pullman's argument that Swint did not have standing to represent the class on the departmental assignment claim. On the promotions issue, however, the court found the seniority system bona fide and entered judgment in favor of Pullman and USW. *See id.* at 11.

In view of its ruling that there had been discrimination in departmental assignments and the selection of supervisors, the court was faced squarely with defining the temporal scope of Pullman's liability. Relying on *Payne v. Travenol Laboratories,* 673 F.2d 798 (5th Cir.), *cert. denied,* 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982), the court held that the liability period

---

**18.** Despite holding that the plaintiffs were entitled to judgment in their favor on all three liability issues, the court did not specify the time period for which Pullman was liable. Its only discussion of the EEOC charges was as follows:

Although the first primary charge directly bringing into question the company's assignment policies was filed on May 11, 1970, a charge had been previously filed by an EEOC Commissioner on March 27, 1967 questioning the hiring and promotion practices of Pullman. Because the district court found this earlier charge to be susceptible to the interpretation that it related also to assignment and transfer matters, the court used the date 90 days before the March 27, 1967 Commission charge for its analysis.

The 1972 amendment to Title VII extended the time for filing charges to 180 days, and this extension has been considered to be effective retroactively.... But, the district court asserts that it finds there was no practice of discriminatory assignments to departments after September 28, 1966 anymore than there was after December 27, 1966. The 180 day statutory period is inconsequential to this analysis.
*Swint VI,* 624 F.2d at 528 n. 1.

should be dated from ninety days prior to the date of Swint's first EEOC charge, i.e., Pullman would not be liable for any discrimination occurring prior to July 17, 1969.[19] *See Swint IX*, slip op. at 6. The court then found that any discrimination in departmental assignments ended prior to February 1969. *See id.* at 13. The bottom line was that there was no discrimination in departmental assignments for which Pullman would have to pay damages. The date on which discrimination in the selection of supervisors ended, the court held, had in effect been set by *Swint VI*. Pullman would be liable for discrimination in the selection of supervisors from July 16, 1969 to August 16, 1974.[20] *See id.* at 8.

The plaintiffs appeal the rulings against them on the seniority system, the date from which Pullman's liability was measured, and the date that discrimination in departmental assignments ended. Pullman, having been granted leave to appeal immediately under 28 U.S.C. § 1292 (1982), appeals the rulings against it on the selection of supervisors and on Louis Swint's standing to represent the class with respect to departmental assignments.[21]

## C. The Larkin Case

Some four years after Louis Swint filed suit against Pullman and USW, on December 9, 1975, the *Larkin* plaintiffs filed a class action against Pullman alone. The complaint alleged that Pullman had excluded blacks from its more desirable jobs and departments and its salaried foremen jobs. On January 20, 1976, the district court dis-

missed the *Larkin* case with prejudice, finding "that all issues presented by the complaint are presently on appeal to the Fifth Circuit Court of Appeals in the case of Louis Swint, ... and that plaintiffs herein are included in the putative class of plaintiffs on whose behalf said appeal was taken." *Larkin v. Pullman-Standard Division, Pullman, Inc. (Larkin I)*, No. 75–G–2266–S, slip op. at 1 (N.D.Ala. Jan. 20, 1976), Record, Vol. I, Tab 4, at 1. The *Larkin* plaintiffs appealed, but the appeal was ultimately dismissed for failure to prosecute. *Larkin v. Pullman–Standard Division, Pullman, Inc. (Larkin II)*, No. 76–1538, slip op. at 1 (5th Cir. Apr. 15, 1976), Record, Vol. I, Tab 6, at 1.

Nothing further happened in the *Larkin* case for several years. In June 1983, however, after this court in *Swint VIII* remanded the *Swint* litigation to the district court, Pullman began urging the *Swint* district court to consider running the liability period from a later date, as of 1969 rather than 1966. Pullman argued that the beginning of the liability period could be based only on the charge of a *named* plaintiff, i.e., on Louis Swint's October 1969 charge. Concerned that such a decision would preclude consideration of claims that the *Larkin* court had dismissed precisely because they were to be considered in *Swint*, the *Swint* plaintiffs moved, in February 1984, to add Spurgeon Seals (a *Larkin* plaintiff who had filed his EEOC charge on November 4, 1966) as an additional named plaintiff. A motion to add all of the *Larkin* plaintiffs as named *Swint* plaintiffs was filed on June 4, 1984.

**19.** The plaintiffs filed a motion to alter or amend the judgment asking the court to apply Alabama's six-year trespass statute of limitations to the section 1981 claims in their case. This would have, at least to the extent that the plaintiffs were able to show intentional discrimination (which section 1981 claims require), worked to extend the liability period backward to 1965. The court refused to alter its previous application of the one-year trespass on the case statute, citing Pullman's reliance throughout the litigation on that decision. *Swint v. Pullman–Standard (Swint X)*, No. CV71–P–0955–S, slip op. at 3 (N.D.Ala. Nov. 26, 1986), Record, Vol. II, Tab 136 at 3.

**20.** It is unclear how the district court arrived at the August 16 date. 1974 appears to have been chosen because the plaintiffs had presented statistical evidence through that date and this court did not distinguish periods of time when, in *Swint VI*, it found that there had been discrimination. *See Swint IX*, slip op. at 8.

**21.** USW remains in the case only as an appellee, because the only issue still disputed and involving USW is whether or not the seniority system was bona fide rather than intentionally discriminatory. For that reason, the bulk of this opinion will refer to Pullman alone.

Pullman allegedly [22] opposed the motions to add the *Larkin* plaintiffs on the ground that *Larkin I,* which included the language, "dismissed with prejudice," constituted an adjudication on the merits that prevented the *Larkin* plaintiffs from pursuing any of their claims against Pullman in *Swint.* The *Larkin* plaintiffs responded by returning to the *Larkin* court and filing a motion for relief from judgment under Fed.R.Civ.P. 60(a) or 60(b)(6). The plaintiffs asked the court to delete the words "with prejudice" from the *Larkin I* order. "[R]eluctant to alter in any way an order of judgment which is over eight years old," the *Larkin* court denied the motion. *Larkin v. Pullman-Standard Division, Pullman, Inc. (Larkin III),* No. 75–G–2266–S, slip op. at 1 (N.D.Ala., Apr. 16, 1984), Record, Vol. I, Tab 8, at 1. The court made clear, however, that *Larkin I* constituted "no opinion as to the rights which these plaintiffs might have as unnamed members of the *Swint* class." *Id.* at 2.

Soon thereafter, without opinion, the *Swint* court denied both of the motions to add the *Larkin* plaintiffs. *See Swint v. Pullman-Standard,* No. CV–71–P–0955–S, slip op. (N.D.Ala. Sept. 4, 1984). In *Swint IX,* the court explained the grounds for the denial: the delay in filing the motions was unreasonable, permitting the intervention would prejudice Pullman, and the *Larkin* plaintiffs would not suffer any prejudice if not permitted to intervene. *See Swint IX,* slip op. at 3–4. The court acknowledged, however, that *Larkin I* did not preclude the *Larkin* plaintiffs' membership in the *Swint* class. *See id.* at 4.

The *Larkin* plaintiffs timely appealed from the judgment in *Larkin III.* This court stayed the appeal pending the outcome on remand in *Swint.* After *Swint IX* and *Swint X* were appealed, the court consolidated the *Swint* and *Larkin* cases.

### III. The Liability Period

The first dispute we must resolve concerns the date from which Pullman's liability [23] must be measured. With respect to the plaintiffs' Title VII claims, the district court held that only the charge of a named plaintiff could be used to start the liability period running and that the period would begin 90, rather than 180, days before Louis Swint's charge was filed. *See Swint IX,* slip op. at 6. With respect to the plaintiffs' section 1981 claims, the court held that liability had to be measured from one year prior to the plaintiffs' filing suit, because Alabama's one-year, trespass on the case statute of limitations was the most appropriate to section 1981 claims. *See Swint X,* slip op. at 3; *supra* note 19.

We will discuss both of these holdings separately. In certain cases, it is necessary only to address whichever approach yields the earliest date of potential liability. Unfortunately, we are unable to do so here. On one of the substantive claims—that involving the selection of supervisors—the plaintiffs appear to have proceeded not on a theory of intentional discrimination but on a theory of disparate impact. Because section 1981 requires a showing of intentional discrimination, *see Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir.1985), the plaintiffs are potentially entitled to relief on this claim only under Title VII, and will not be able to benefit from the longer liability period we adopt for the section 1981 claims.

### A. Dating the Title VII Claims

██ Title VII requires that an employee file an EEOC charge within 180 days [24] of an allegedly illegal employment practice if he intends to bring a civil suit based on that practice. *See* 42 U.S.C. § 2000e–5(e) (1982). In addition to operating as a stat-

---

**22.** It appears that Pullman did not file a written response to the plaintiffs' motions to add the *Larkin* plaintiffs, so we have been unable to verify that Pullman actually made this argument.

**23.** We address only Pullman's liability. As will become clear later in the opinion, we affirm the district court's ruling that USW has not violated Title VII or § 1981.

**24.** On March 24, 1972, Title VII was amended to extend the filing period from 90 days to 180 days. *See* Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4(a), 86 Stat. 103, 105 (1972) (codified at 42 U.S.C. § 2000e–5(e) (1982)). The retroactivity of this amendment will be discussed in connection with the district court's backdating Swint's charge 90 rather than 180 days.

ute of limitations, this requirement has been interpreted to shield a Title VII defendant from damages for any like conduct he may have engaged in prior to 180 days before the filing of a charge.[25] *See United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977); *Fisher v. Proctor & Gamble Manufacturing Co.*, 613 F.2d 527, 540 & n. 25 (5th Cir.1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981). The issue here involves the latter aspect of the 180-day period: selecting the appropriate EEOC charge to establish the date Pullman's liability commences.

The plaintiffs argue that dating the liability period from the first EEOC charge complaining of like practices, regardless of whether the charge was filed by a named plaintiff, is the correct approach. They also contend that by dating Pullman's Title VII liability from Louis Swint's October 1969 charge, the district court violated the law of the case. They point to the court's 1974 certification of the class, which included "all black persons who are now or have (within one year prior to the filing of *any* charges under Title VII) been employed by defendant Company." Record, Vol. II, Tab 18 at 1 (emphasis added). In the plaintiffs' view, this constituted a holding that liability would be measured from Seals' November 1966 charge. The plaintiffs also cite the court's discussion in *Swint III*, where the court assumed that liability should be dated from 90 days prior to Commissioner Shulman's March 1967 charge. 15 F.E.P. at 146 n. 5. Finally, the plaintiffs direct us to the pretrial order entered prior to the last trial, in 1984. The district court there instructed the parties to prepare for trial on the assumption that the anterior cutoff date would be 180 days prior to Seals' EEOC charge. Record, Vol. II, Tab 96 at 1; *see supra* note 25.

The plaintiffs maintain further that despite all these suggestions, if not holdings, that the liability period would be dated from 1966, it was not until 1983 and the rulings against it in *Swint VI* that Pullman raised any objection to a 1966 cutoff date. Thus, even if Swint's charge should have been the one from which liability was dated, Pullman waived any objection it might have had. To find otherwise, the plaintiffs contend, would be especially inequitable given the decision in *Larkin I* that the *Larkin* plaintiffs' claims were precluded because they were adequately covered by the *Swint* litigation: the *Larkin* court surely would not have so decided had it been aware that three years of the plaintiffs' claims were going to be severed from *Swint* on the fourth trial of the case.

Pullman asserts that the plaintiffs' representation of the district court's decisions is inaccurate and that none of the district court's discussions constituted a holding on the liability period. As a result, the law of the case did not preclude the district court's setting the July 17, 1969 date, and under *Kilgo v. Bowman Transportation Inc.*, 789 F.2d 859 (11th Cir.1986), and *Payne v. Travenol Laboratories*, 673 F.2d 798 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982), a Title VII liability period can be dated only from a *named plaintiff's* charge. Pullman also insists that the standing principles enunciated in *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), dictate that a named plaintiff cannot represent class members on claims that accrued before his own.

We hold that the district court erred in dating Pullman's potential liability from 90 days prior to Swint's EEOC charge. The circumstances of this case, when combined with Title VII's role as remedial legislation, convince us that the district court improp-

---

**25.** At first blush, the statement in the text may seem tautologous. It is conceivable, however, that, in the continuing violation context, a plaintiff could file a charge within 180 days of the violation, thereby meeting the statute of limitations, and still attempt to recover damages for harmful effects suffered well before 180 days

prior to the EEOC charge. In addition, it is important to distinguish the two concepts in class actions, where class members who did not themselves file EEOC charges will be bound, and may be foreclosed from recovery, by the liability period that someone else's charge creates.

erly narrowed the *Swint* litigation after the fourth trial of the case. Pullman's potential Title VII liability should have been dated from September 28, 1966, 180 days prior to Commissioner Shulman's charge alleging that Pullman had discriminated in its hiring and promotional practices.

It is apparent that Pullman waived any objection it might have had to such a date. The district court discussed the case from the very beginning as if Pullman's potential liability might be dated from 1966. Due to its various dispositions of the case, the district court stopped short of so *holding;* for that reason, the law of the case does not require us to accept a 1966 date. *See Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164, 1169 (5th Cir. Unit A Sept. 1981) ("law of the case does not operate to bar subsequent consideration of matters that could have been, but were not, raised and resolved in the earlier proceeding"), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1441, 71 L.Ed.2d 656 (1982); *see also Robinson v. Parrish,* 720 F.2d 1548, 1550 (11th Cir. 1983) (district court need not "rigidly adhere to its own rulings in an earlier stage of a case"). Even so, the 180–day filing requirement, "like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Insofar as the liability period is simply the inverse of the filing requirement, it too must be subject to waiver and estoppel. By failing before 1983 to raise any objection to the numerous suggestions that 1966 might be set as the anterior cutoff date for its liability, as well as arguing in the *Larkin* case that the *Larkin* plaintiffs' claims—which indisputably dated back to 1966—were being litigated in the *Swint* case, Pullman waived any objection it might otherwise have had.[26]

In any event, in this case dating liability from 1966 is the most appropriate and logical holding. In considering this issue, it is important to look at the purposes of the 180–day filing requirement, insofar as that requirement dictates the liability period. It is well-established that potential plaintiffs are required to file an EEOC charge within 180 days of an allegedly illegal act or practice so that employers will be given prompt notice of the complaints against them, and the EEOC sufficient time to attempt the conciliation process before a civil action is filed. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. at 398, 102 S.Ct. at 1135; *Kilgo v. Bowman Transportation, Inc.,* 789 F.2d at 877; *Crawford v. United States Steel Corp.,* 660 F.2d 663, 666 (5th Cir. Unit B Nov. 1981). Neither of these purposes would be defeated by permitting the charge of the Commission to establish the temporal scope of this action. Spurgeon Seals filed an EEOC charge in November 1966 complaining that the seniority system was being misapplied on account of his race, and less than six months later, an EEOC Commissioner filed a charge launching a broad-based challenge to Pullman's hiring and promotional practices. By the time Louis Swint filed his 1969 charge, Pullman was well aware that its hiring and promotional practices were under scrutiny, and the EEOC had been given ample time to attempt conciliation. To ignore this and restrict Pullman's liability to 180 days prior to Swint's charge would be nothing more than a technical reading of Title VII, which is "particularly inappropriate in a statutory scheme in which layment, unassisted by trained lawyers, initiate the process." *Love v. Pullman Co.,* 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679 (1972).

Indeed, one case from this circuit (cited, oddly, by Pullman) has already held that, in appropriate circumstances, liability may be dated from the EEOC charge of a person other than one of the named plaintiffs.[27]

---

**26.** There is a strategic reason why a class action defendant might waive objections to the size or inclusiveness of a class: a favorable decision against an all-inclusive class of plaintiffs will in many instances bar further suits.

**27.** The Seventh Circuit and several district courts have so decided as well. *See McDonald*

*v. United Airlines,* 587 F.2d 357, 361 (7th Cir. 1978) (liability could be dated from charge filed by two class members who were not named plaintiffs where their charges gave the employer sufficient notice that certain practices were challenged), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979); *Allen v. Isaac,* 99

In *Kilgo v. Bowman Transportation, Inc.*, Edna Kilgo, who had filed an EEOC charge earlier than any other member of the class, died before the class was certified. Her husband was permitted to substitute for her as a class member, but was found an inadequate class representative to serve as a named plaintiff. After concluding that the purposes of the 180–day filing requirement had been met by Kilgo's charge—the employer had notice of the claim and the EEOC was given an opportunity to settle the grievance—this court held that the date of her EEOC filing could be used to determine the temporal scope of the action. *See Kilgo*, 789 F.2d at 877. Not only was this result fair to the employer, in that it turned on his receiving adequate notice, but it advanced judicial economy by ensuring that all the claims of employees discriminated against in similar fashion were heard in a single action.[28] The same can be said of our decision to permit the charge of a non-named plaintiff to establish the temporal scope of the action.[29]

Pullman asserts that *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. at 147, 102 S.Ct. at 2364, 72 L.Ed.2d at 740, prevents using a non-named plaintiff's charge to date liability. In *Falcon*, the Supreme Court held that a person who has not himself suffered a particular type of discrimination does not have Rule 23(a)

standing to bring a class action for those who have, simply because he and the class have both suffered forms of racial discrimination. *See id.* at 158, 102 S.Ct. at 2371. Pullman apparently reasons from this that a class representative also cannot represent class members on portions of their claims for which the representative would not, due to the 180–day filing requirement, have been able to sue; reasoning backward from this proposition, Pullman concludes that liability must be dated from the named plaintiff's charge. The company also argues that it could not have waived any objections to a 1966 date because standing is a *jurisdictional* and thus non-waivable issue.

We do not agree. First, the Court made clear in *Falcon* that its decision was based on the commonality and typicality requirements of Fed.R.Civ.P. 23(a), and there is no reference in the opinion to the constitutional requirement of standing.[30] *See id.* at 160, 102 S.Ct. at 2372 ("The District Court's error in this case, and the error inherent in the across-the-board rule, is the failure to evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)."). Because Rule 23's requirements have never been regarded as jurisdictional,[31] Pullman's argument that it cannot

---

F.R.D. 45, 50 (N.D.Ill.1983); *Williamson v. Bethlehem Steel Corp.*, 488 F.Supp. 827, 830–35 (W.D.N.Y.1980); *Petty v. Peoples Gas Light & Coke Co.*, 86 F.R.D. 336, 342 (N.D.Ill.1979); *see also Inda v. United Airlines*, 83 F.R.D. 1, 7–8 (N.D.Cal.1979).

**28.** To insist that liability be dated only from a named plaintiff's charge would essentially force whomever in a class of employees filed the earliest EEOC charge to do one of three things: act as the class representative, file a separate action covering the period of time that would not be covered by the class suit, or give up altogether a portion of his claim. Noting that there are many reasons a class member might not wish or be able to act as his class' representative, we reject the opportunity to fashion a per se rule that would have this effect.

**29.** We do not, of course, address the situation when a class member files an EEOC charge and receives a right-to-sue letter, and then no suit is filed within the period specified by the letter. The situation here is quite different. The

charges filed by the *Larkin* plaintiffs and Commissioner Shulman were still pending before the Commission when Swint filed suit, so there was no indication that those who filed the earliest charges intended to abandon their causes of action.

**30.** Indeed, the word "standing" appears only one time in the entire opinion, in a footnote: "The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer." *Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. We do not read this statement as a reference to constitutional, jurisdictional standing.

**31.** The Supreme Court has recognized that the Congress that enacted Federal Rule 23 was advised that it would neither expand nor constrict subject matter jurisdiction. *See Snyder v. Harris*, 394 U.S. 332, 341, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969). It follows that the require-

have waived any objections to a 1966 date is without merit. *See, e.g., Reynolds v. Sheet Metal Workers, Local 102,* 702 F.2d 221, 224 (D.C.Cir.1981) ("[a] claim that the district court erred in its class certification decision does not go to the court's subject matter jurisdiction"); *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 912–13 (9th Cir.1964) (the requirements of Federal Rule 23(a) are not jurisdictional). This seems all the more apparent when one remembers that the liability period derives directly from the 180–day filing requirement, which the Supreme Court has expressly held is in the nature of a statute of limitations and waivable. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. at 398, 102 S.Ct. at 1135.

■ Second, even if we were to read *Falcon* as a case involving a jurisdictional type of standing, it does not necessarily follow from a requirement that a named plaintiff have suffered the same type of injury as those he represents that he is also required to have suffered it (*and* filed an EEOC charge) at precisely the same time. *Cf. Domingo v. New England Fish Co.,* 727 F.2d 1429, 1442 (9th Cir.1984) (named plaintiff may represent all class members whose claims were not already time-barred at the time he filed his charge); *Spalitta v. National American Bank of New Orleans,* 444 F.2d 291, 294 (5th Cir.) (named plaintiff could represent stockholders on certain fraud claims even if the frauds did not occur while the plaintiff was a stockholder), *cert. denied,* 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 164 (1971). The commonality and typicality requirements of Federal Rule 23(a) are phrased in substantive terms: a party may sue on behalf of a class only if "(2) there are questions of law or fact common to the class, [and] (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(2), (3). A disparity in the forms of discrimination suffered will cause the questions of law and fact and the claims and defenses of the named plaintiff and the class members to be different. In contrast, a disparity in the dates on which the named plaintiff and other class members filed EEOC charges does not mean that the legal questions or the claims will be different.

■ Our holdings that Pullman waived any objection to a 1966 date and that a non-named plaintiff's charge may govern do not end our inquiry. We must still determine which of the EEOC charges could give rise to the class claims that were ultimately brought. Unless a charge alleges practices "like or related to" the practices alleged in the complaint, it cannot serve as the basis for a civil action. *See Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 928 (11th Cir.1983); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970). The Supreme Court has elaborated on this "like or related to" test: "Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable." *General Telephone Co. v. EEOC,* 446 U.S. 318, 331, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

Having considered these principles, we conclude that Commissioner Shulman's March 1967 charge is the earliest charge including allegations sufficiently like or related to those in the complaint.[32] The charge alleged that Pullman had discriminated in its hiring and promotional practices. The investigation that followed ad-

---

ments of Rule 23 are not jurisdictional requirements that cannot be waived. *See also Franks v. Bowman Transportation Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–60, 47 L.Ed.2d 444 (1976) (class retains standing despite mooting of named plaintiff's Title VII claim).

**32.** The plaintiffs' brief to this court suggests that Spurgeon Seals' November 1966 charge could be used to date the liability period. On June 6, 1983, the plaintiffs filed a motion expressly asking the district court to date Pullman's liability

from Commissioner's Shulman's *March 1967* charge. In light of the numerous allegations already in the case that given arguments have been waived or are foreclosed by the law of the case, we find the plaintiffs' failure to acknowledge that they made this argument very irritating. In any event, we are not convinced that Seals' charge was sufficiently like or related to the charges in Swint's complaint. It alleged that the seniority system was discriminatorily *misapplied,* not that the seniority or assignment systems were in themselves discriminatory.

dressed every practice that would ultimately be challenged in Swint's complaint: initial assignments to departments and jobs, temporary assignments, opportunities for training, promotions, the seniority system, and the selection of supervisors. Pullman thus received more than sufficient notice that several of its plantwide policies and practices were under attack.

 Pullman argues that the Commissioner's charge cannot be used as a basis for Swint's suit because certain statutory requirements were not met. The language on which the Company relies is as follows:

> If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (d) of this section, whichever is later, the Commission has not filed a civil action under this section ..., or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission ... *shall so notify the person aggrieved* and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom *the charge alleges was aggrieved* by the alleged unlawful employment practice.

42 U.S.C. § 2000e–5(f)(1) (1982) (emphasis added). Directing us to the emphasized language, the company complains that Swint was not named in the charge and that the Commission did not issue Swint a right-to-sue letter in connection with the proceeding involving the *Commissioner's* charge. We reject this argument for several reasons. First, Pullman presents this challenge for the first time on appeal and we can perceive no miscarriage of justice that might result from following the general rule that such challenges will not be considered. *See Sanders v. United States,* 740 F.2d 886, 888 (11th Cir.1984); *Roofing & Sheet Metal Services, Inc. v. La Quinta*

*Motor Inns, Inc.,* 689 F.2d 982, 989–90 (11th Cir.1982). Pullman had adequate opportunity to raise these arguments before the district court, especially after the plaintiffs filed a specific written request that the court date liability from the Commissioner's charge. Second, Pullman's claim that Swint had to be expressly named in the Commissioner's charge to qualify as an "aggrieved" individual under the statute is specious. The statute expresses a clear congressional intent that private suits be permitted to proceed on Commissioner's charges. Pullman's interpretation conflicts with that intent because it would essentially prohibit suits where a Commissioner acts on behalf of a class so large—such as "black employees of Pullman-Standard's Bessemer, Alabama plant"—that every member cannot be named. Finally, assuming without deciding that the statute required Swint to obtain a separate right-to-sue letter in connection with the Commissioner's charge—he did obtain one in connection with his *own* EEOC charge—any such defect was cured when the plaintiffs introduced the EEOC decision concerning the Commissioner's charge into evidence. *See Pinkard v. Pullman-Standard,* 678 F.2d 1211, 1219 (11th Cir.1982) ("the receipt of a right-to-sue letter subsequent to the commencement of a Title VII action, but while the action remains pending, satisfies the precondition that a plaintiff obtain statutory notice of the right to sue before filing a civil action"), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 954 (1983). It is well-settled that the requirement that a plaintiff receive a right-to-sue letter is subject to equitable modification. *See id.* at 1218–19. It is also clear that the purpose of the requirement is to provide the employee with notice that his administrative remedies with the Commission have been exhausted, *see Beverly v. Lone Star Lead Construction Corp.,* 437 F.2d 1136, 1140 (5th Cir.1971), and in turn ensure that the employee has given the EEOC time to take action on the case. The EEOC's written decision finding that there was reasonable cause to believe that Pullman had violated Title VII served this purpose as well as any right-to-sue letter would have.

■ Pullman's potential liability on the plaintiffs' Title VII claims dates from September 28, 1966, 180 days prior to Commissioner Shulman's charge. At the time the Commissioner's charge was filed, the period within which a charge had to be filed—and thus the liability period—was 90 days, *see* 42 U.S.C. § 2000e–5(e) (1970), but an amendment to Title VII in 1972 increased the period to 180 days. The amending legislation stated that it was to apply to anyone whose charges were pending before the Commission when the legislation was passed. *See* Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 14, 86 Stat. 103, 113. The amendment was enacted on March 24, 1972, and the Commission's final decision on Commissioner Shulman's charge issued on April 26, 1972. Shulman's charge should thus be backdated 180, rather than 90, days.

### B. Dating the Section 1981 Claims

■ Although section 1981 provides a federal cause of action, claims under it must be brought within the period set by the most appropriate statute of limitations of the state in which the court sits. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed. 2d 295 (1975); *Whatley v. Department of Education*, 673 F.2d 873, 874 (5th Cir. 1982). The length of the statute of limitations will in turn establish how far back from the filing of the complaint the liability period will reach. *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1255 (5th Cir.1979), *aff'd on rehearing*, 619 F.2d 459, 463 (5th Cir.1980), *aff'd on other grounds*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981). Since the racial discrimination section 1981 prohibits is "a fundamental injury to the individual rights of a person," the applicable statute of limitations will be one governing personal injury, as opposed to contract, actions. *Goodman v. Lukens Steel Co.*, — U.S. —, —, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987); *see also Wilson v. Garcia*, 471 U.S. 261, 275, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985) (section 1983 actions should be treated as if for personal injury). The problem here is that when Swint filed suit, Alabama had *two*

statutes of limitations that applied to personal injury actions. Section 6–2–34(1) provided that "[a]ctions for any trespass to person or liberty" must be brought within six years. Ala.Code § 6–2–34(1) (1977). Section 6–2–39(a)(5) provided that "[a]ctions for any injury to the person or rights of another not arising from contract" must be brought within one year. *Id.* § 6–2–39(a)(5) (repealed 1984).

The plaintiffs argue that the six-year statute, section 6–2–34(1), applies. They cite this court's 1985 decision in *Jones v. Preuit & Mauldin*, 763 F.2d 1250, 1256 (11th Cir.1985), that the six-year statute applies to section 1983 claims. They then rely on *Goodman v. Lukens Steel*, 107 S.Ct. at 2621, for the proposition that the same statute of limitations should be applied to section 1981 actions as is applied to those under section 1983.

Pullman insists that the one-year statute, section 6–2–39(a)(5), applies. The company likens this employment discrimination case to a tort action for interference with contractual relations and cites Alabama cases holding that such actions are governed by section 6–2–39(a)(5). *See, e.g., Teng v. Saha*, 477 So.2d 378, 379 (Ala.1985). Pullman also contends that even if we now deem the six-year statute applicable, presumably on the authority of recent cases, those cases should not be applied retroactively because the company has relied throughout the litigation on the one-year period.

We agree with the plaintiffs that the six-year statute should be applied. *Goodman* directs us to adopt the same state statute of limitations for both section 1983 and section 1981 actions, and this court has already adopted the six-year statute for section 1983 claims brought in Alabama. *See Jones v. Preuit & Mauldin*, 763 F.2d at 1256. We also conclude that retroactive application of the six-year statute is appropriate on the facts of this case.

In *Goodman*, 107 S.Ct. at 2621, the Supreme Court held that the employees' section 1981 action was subject to Pennsylvania's two-year statute of limitations governing personal injury actions. The em-

ployees had argued that the six-year state statute of limitations applicable to interference with contractual relations was the most appropriate. *See id.* The employees recognized that, under *Wilson v. Garcia,* 471 U.S. at 268, 105 S.Ct. at 1943, section *1983* actions were to be treated as personal injury actions, but they argued that section *1981* actions should be characterized differently under federal law because the paradigmatic section 1981 claim involved economic, rather than personal, rights. *See Goodman,* 107 S.Ct. at 2621. The Court disagreed. Justice White, writing for the Court, stated:

> *Wilson's* characterization of § 1983 claims is ... *equally appropriate* here, *particularly since § 1983 would reach state action that encroaches on the rights protected by § 1981.* That § 1981 has far-reaching economic consequences does not change this conclusion, since such impact flows from guaranteeing the personal right to engage in economically significant activity free from racially discriminatory interference.

*Id.* (emphasis added). We are convinced from this language that the Court intended that the same statute of limitations be applied to all section 1983 and section 1981 actions in a given state. The Court's reference to the overlap between the two civil rights statutes suggests that it would not approve a characterization of section 1983 claims as one type of personal injury and a characterization of section 1981 claims as another type of personal injury.

We are additionally persuaded that this conclusion is correct by the history of *Goodman* before it reached the Supreme Court. The Third Circuit had taken the case under en banc consideration, and had concluded not only that the employees' claims were governed by Pennsylvania's general personal injury statute of limitations, but that the federal interests in uniformity and certainty were "best served by applying the same statute of limitations to all of the Reconstruction Civil Rights Cases." *Goodman v. Lukens Steel Corp.,* 777 F.2d 113, 120 (3d Cir.1985). In affirming, the Supreme Court apparently was not troubled by the latter proposition. Justice

White stated flatly: "The Court of Appeals properly rejected [the plaintiffs'] submission." *Goodman v. Lukens Steel,* 107 S.Ct. at 2621.

Even without the language in *Goodman,* we would consider this a sound result as a policy matter. In *Wilson v. Garcia,* the Court recognized that, although section 1988 mandates reference to state law when choosing a statute of limitations in a civil rights action, "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" dictate that the same statute of limitations be applied to all section 1983 actions in a given state. 471 U.S. at 275, 105 S.Ct. at 1947. These same interests are implicated when the choice is whether to apply one statute of limitation to a section 1983 claim and another statute to a section 1981 claim, particularly since both types of claims are often brought together in a single action. *See Goodman v. Lukens Steel Corp.,* 777 F.2d 113, 120 (3d Cir.1985) ("Application of Pennsylvania's six year statute of limitations where the same claim [as is brought under section 1983] is brought under § 1981 would lead to a bizarre result."), *aff'd,* — U.S. —, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *accord Friedlander v. Troutman, Sanders, Lockerman & Ashmore,* 788 F.2d 1500, 1503 n. 2 (11th Cir.1986) (dictum) ("The same single limitations period should apply to § 1981 claims [as applies to § 1983 claims]."). Applying a single limitations period to section 1981 and section 1983 claims should make it easier for civil rights plaintiffs in Alabama to determine the dates by which they must assert their rights, and will prevent excessive litigation when both a private (section 1981) defendant and a government (section 1983) defendant are involved.

In view of our holding that the same state limitations period applies to both section 1981 and section 1983 claims, and in view of this court's earlier decision that section 1983 claims in Alabama are governed by the state's six-year personal injury statute, *see Jones v. Preuit & Mauldin,* 763 F.2d at 1256, Pullman's liability on the plaintiffs' section 1981 claims should be

dated from October 19, 1965, six years prior to the filing of Swint's complaint. We recognize that this decision conflicts with earlier circuit decisions in *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir.1980), *Ingram v. Steven Robert Corp.*, 547 F.2d 1260, 1263 (5th Cir.1977), and *Buckner v. Goodyear Tire & Rubber Co.*, 476 F.2d 1287, 1287 (5th Cir.1973) (adopting district court opinion in *Buckner v. Goodyear Tire & Rubber Co.*, 339 F.Supp. 1108 (N.D.Ala.1972)), but it seems plain that the Supreme Court's decisions in *Wilson* and *Goodman* discussing the nature of section 1983 and section 1981 claims have rendered the analysis of those earlier cases obsolete. When the rationale of our earlier cases is substantially undercut, we are not only free but required to revisit the issue involved. *See Leach v. Pan American World Airways*, 842 F.2d 285, 286, 288 (11th Cir.1988); *Gresham Park Community Organization v. Howell*, 652 F.2d 1227, 1234–35 (5th Cir. Unit B Aug. 1981).

■ Pullman insists that, notwithstanding our holding today that the six-year statute applies, our decision should not be applied retroactively. In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court held that although retroactive application of judicial decisions was the general rule, three factors must be considered in determining whether it is proper in a given case: (1) whether the new limitations period has been occasioned by a change in the substantive law the purpose of which would not be served by retroactivity; (2) whether the decision overruled clear past precedent on which the complaining party was entitled to rely; and (3) whether retroactive application would be inequitable. *Id.* at 106–07, 92 S.Ct. at 355. Pullman makes no argument with respect to the first factor, and admits, with respect to the second factor, that there was no clear precedent establishing a one-year limitation period in Alabama until *Buckner v. Goodyear Tire & Rubber Co.*, 476 F.2d at 1287, came out in 1973, over a year after the complaint was filed. The company argues, however, that the strength of the third *Huson* factor dictates that *Wilson* and *Goodman* not be applied retroactively. According to Pullman, it would be inequitable to apply the six-year statute given that the company has relied on the one-year statute for so long.

Under the circumstances, this argument is more than slightly ironic, and we reject it. First, it cannot be said that any aspect of the liability period—either the appropriate section 1981 statute of limitations or the relevant EEOC charge—was ever clarified, in those terms. Indeed, if anything regarding the period *was* made clear, it was that liability would be dated from sometime in 1966,[33] *see supra* part IIIA, only a few months after the October 19, 1965 date that the six-year statute would prescribe.

Second, assuming that the class definition was the district court's indication of

---

**33.** Pullman makes a rather remarkable argument that the six-year statute cannot be applied, because the final pretrial order of September 19, 1983 "defined the scope of the action and anterior cut-off date in such a way as to be clearly inconsistent with a six-year statute," and the company prepared for trial on that basis. Brief of Defendant-Appellee Pullman-Standard at 61 (Sept. 8, 1987). Apart from the fact that the pretrial order to which Pullman refers did not address the *section 1981*, as opposed to the Title VII, statute of limitations, the order specifically instructed the company to prepare for a period dating from May 4, 1966, only six and one-half months short of the six years.

The court has not decided the issue of which EEOC charge will control. Plaintiffs indicated that a charge was filed against the Company by one Spurgeon Seals, a member of the plaintiff class, on October 30, 1966, and that this charge was still pending on March 24, 1972. This court has not decided whether, absent amendment of the complaint to add Seals as a named plaintiff, his charge is fully transferable to the class. *But for the purposes of trial preparation, counsel should assume that the anterior cutoff date is 180 days prior to October 30, 1966.* Record, Vol. II, Tab 96 at 1 (emphasis added). Perhaps this is why Pullman prepared exhibits relating not only to the 1969–1974 period, as its brief to this court suggests, but also to the 1964–1969 period, as the district court's order makes quite clear. *See Swint IX*, slip op. at 12. In any event, we find that Pullman did not meaningfully rely on any holding that the one-year statute was applicable.

the appropriate section 1981 statute of limitations, it must be acknowledged that the definition read, "all black persons who are now or have (within one year *prior to the filing of any charges* under Title VII) been employed by defendant Company." Record, Vol. II, Tab 18 at 1 (emphasis added). The emphasized language reflects the district court's reliance on then-prevailing law holding that an EEOC charge tolled the applicable section 1981 statute of limitations. *See Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1378 (5th Cir.1974) (decided March 27, 1974, two months before the district court's certification of the class); *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011, 1017 n. 16 (5th Cir.1971). That principle stood until the Supreme Court overruled it in *Johnson v. Railway Express, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). Thus, by arguing that we should apply Alabama's one-year statute of limitations *and* run it backward from the date of the complaint (rather than any EEOC charge, as the class certification suggests),[34] Pullman essentially urges us to apply only *Johnson,* the case in its *favor,* retroactively.

We decline to do so. Nothing definite was said about the liability period until the district court's 1986 decisions in *Swint IX* and *Swint X,* and neither side has demonstrated that it adopted a prejudicial position in reliance on the law prevailing prior to the *Johnson, Wilson,* and *Goodman* decisions. Indeed, when Pullman filed its original answer, it pled the *six-year* statute.[35] When the law was clarified in 1973, dictating that the one-year statute should be applied, Pullman did not move for leave to

amend its answer, and we find nothing else in the record to support the district court's apparent shift to the one-year statute in the pretrial class certification. Under most circumstances, this failure to replead would constitute a waiver of the shorter statute. *See, e.g., Paetz v. United States,* 795 F.2d 1533, 1536 (11th Cir.1986); *Johnson–Manville Sales Corp. v. Mitchell Enterprises, Inc.,* 417 F.2d 129, 131 (5th Cir.1969). We find it unnecessary, however, to go that far: suffice it to say that Pullman cannot claim for retroactivity purposes that it relied on the one-year statute.

In sum, the most equitable result is to apply retroactively *all* of the Supreme Court decisions pertaining to the liability period. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 335, 91 S.Ct. 795, 804, 28 L.Ed.2d 77 (1971) (interests of justice required that if counterdefendant's belated limitation defense was to be considered on its merits then counterclaimant's belated tolling argument must be dealt with as well). Alabama's six-year statute of limitations should therefore be applied, and Pullman's potential liability should be dated from October 19, 1965, six years prior to the filing of Swint's complaint.[36]

## IV. Departmental Assignments

Both Pullman and the plaintiffs have appealed certain aspects of the district court's decision that Pullman's departmental assignments of new hires were racially discriminatory. Pullman complains that the departmental assignments of new hires were never in the case as an independent issue, and, relatedly, that Louis Swint has no standing to represent the class on the

---

**34.** It might be possible for the one-year statute to be applied but run backward from the Commissioner's *EEOC charge,* but Pullman appears to find any compromise on this score unacceptable. The discussion in its brief of the liability period is entitled, "The Court Below Correctly Held that All Liability for Periods Before July 17, 1969 Is Barred," and the company makes no mention of the fact that such a finding would require us to apply *Johnson v. Railway Express* retroactively.

**35.** Pullman's answer read: "This defendant avers that the applicable statutes of limitations,

Alabama Code, Title 7, Sections 21 and 22, bar all claims made in the complaint, based on 42 U.S.C.A., Section 1981, arising more than *six years prior to the filing of the complaint."* Record, Vol. I, Tab 5 at 11 (emphasis added).

**36.** As indicated earlier, this ruling will apply only to the plaintiffs' claim of discrimination in initial assignments, as section 1981 requires proof of intentional discrimination, and the plaintiffs succeeded on their claim concerning the selection of supervisors only on a disparate impact, and thus Title VII, basis.

issue because he was hired prior to the effective date of Title VII. The plaintiffs contend that the district court's finding that all discrimination in assignments ended by February 1969 was in error. We will address these arguments in turn.

### A. Departmental Assignments as an Independent Issue

■ Pullman argues that the evidence pertaining to the departmental assignments of new hires came into the case only as circumstantial evidence that the nontransferable seniority system was intended to lock blacks into the departments with consistently lower JC-level jobs. In Pullman's view, this means that the plaintiffs are not entitled to relief on the assignments as a separate claim. We disagree.

The plaintiffs here alleged that they had worked for the company for years without the upward mobility of younger, less senior whites in other departments. They attributed this disparity primarily to the seniority system, reasoning that the departmental-only seniority had the effect of locking blacks into the low-ceiling and often segregated departments to which they were assigned on a discriminatory basis prior to the enactment of Title VII. When the suit was filed, the Supreme Court had not yet decided *Teamsters*, and the plaintiffs had to show only that a seniority system perpetuated past discrimination—here, the departmental assignments of new hires—to prove that it was not bona fide. In the course of trying to prove this, it became apparent that the discriminatory departmental assignments did not end with the enactment of Title VII. Pullman would have us ignore this fact because, as the case was first conceived, discriminatory departmental assignments were merely an element of the larger claim that the nontransferable seniority system was discriminatory and were not cast as an independent claim.

For two reasons, we decline to construe the plaintiffs' case so narrowly. First, precisely because the issue of departmental assignments was at all points integral to the plaintiffs' attack on the seniority system, Pullman has had full opportunity throughout the proceeding to defend against the plaintiffs' claim that the assignments were discriminatory. The company does not claim otherwise. Second, a rule requiring plaintiffs to identify precisely what has caused the disparity in their treatment, and to suffer the loss of a claim should they be ignorant of hidden practices or mistaken in their emphasis, would lead us away from the truth, not toward it. In *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985), for example, the plaintiffs levied a general challenge to their employer's promotional practices. The employer responded by attacking the plaintiffs' statistics, asserting that the statistical pool the plaintiffs used included employees that had not yet made it onto a supervisory register. The district court dismissed the case primarily for this reason. *Id.* at 1521. On appeal, this court reversed, specifically holding that if the procedures used to qualify employees for the supervisory register were themselves discriminatory, *those* procedures could serve as the basis for relief. *See id.* at 1525. In discussing the way an employment discrimination action usually unfolds, the court found that it did not matter that the plaintiffs had not initially identified or challenged the procedures for reaching the register:

> [T]he purpose of Title VII is the removal of artificial, arbitrary and unnecessary barriers to employment which operate invidiously to discriminate on the basis of race or other impermissible classifications.... "This purpose is not well-served by a requirement that the plaintiff in every case pinpoint at the outset the employment practices that cause an observed disparity between those who appear to be comparably qualified."

*Id.* at 1528 (quoting *Segar v. Smith*, 738 F.2d 1249, 1271 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985)). This case is analogous, in that the plaintiffs challenged the promotional system generally, and eventually it appeared that the disparity could have resulted as much from post-Title VII discrimination in assignments as from such discrimination prior to Title VII.

## B. Swint's Representation of the Class on the Issue of Discriminatory Assignments

▮ Pullman makes a related claim that Louis Swint and Willie Johnson are without standing to represent the class on the issue of departmental assignments of new hires because they were hired—and assigned to the Steel Erection Department—prior to July 2, 1965, the effective date of Title VII.[37] As in its argument concerning the dating of the liability period, Pullman relies on *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. at 147, 102 S.Ct. at 2364, 72 L.Ed.2d at 740, which requires that a named plaintiff have actually suffered a specific discriminatory practice if he is to represent the class in challenging that practice. The company defends its failure to challenge the named plaintiffs' standing earlier on the ground that *Falcon* constituted new law.

Pullman's argument that it had no basis on which to raise a standing claim earlier in the proceeding is persuasive. *Falcon* was new law; in fact, the decision reversed a ruling from this circuit. *See General Telephone Co. of the Southwest v. Falcon*, 626 F.2d 369, 375 (5th Cir.1980). Until *Falcon* was handed down, this circuit required only that a named plaintiff have suffered some form of discrimination on the same general basis—race, sex, religion—as the members of his class. *See, e.g., Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 900 (5th Cir.), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir.1969).

We are not persuaded, however, by Pullman's argument on the merits of its objection. As we noted earlier, *Falcon* was concerned with whether the commonality and typicality requirements of Fed.R.Civ.P. 23, governing class actions, were met. The case involved a named plaintiff complaining that he had been passed over for promotion and yet attempting to represent other Mexican–Americans who had not been hired.

The Court found that Rule 23 standing could not be based solely on the fact that the named plaintiff and the class members had both suffered discrimination based on their national origin. *See Falcon*, 457 U.S. at 158, 102 S.Ct. at 2371.

The Court acknowledged, however, that provided he is attacking the same discriminatory practice, a named plaintiff may have standing even though he is challenging its effects on an aspect of his employment different from that of some of the class members: an employee denied promotions because of a discriminatory test may represent persons who were not *hired* because of the same test. *See id.* at 159 n. 15, 102 S.Ct. at 2371 n. 15. The Court also stated that "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion." *Id.* This court has since recognized these "exceptions to the general rule" and emphasized that they are exceptions precisely because they are circumstances in which the commonality and typicality requirements of Rule 23 are satisfied. *Griffin v. Dugger*, 823 F.2d 1476, 1487 (11th Cir.1987).

We believe that the commonality and typicality requirements of Rule 23 are satisfied by Swint's and Johnson's representation of the class on the issue of discriminatory assignments of new hires even though, because of the date they were hired, they personally may not recover on the assignments as an independent claim. *See East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977) (where class claims have already been tried and initial certification was proper, class members' claims "[do] not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims"). As we noted earlier, *see supra* part III.A, Rule

---

37. According to Pullman, Swint was hired on November 24, 1964, and Johnson was hired on January 12, 1956.

23 requires that there be "questions of law or fact common to the class, [and that] the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(2), (3). From the start, the plaintiffs' basic complaint has been that Pullman prevented black employees from moving into its higher-level positions through a combination of discriminatory initial assignments and a departmental-only seniority system. At the time of certification, this claim was legally identical to that of every other member of the class.

The fact that the plaintiffs' claim was ultimately broken up into two components —the assignments of new hires and the seniority system itself—because the *Teamsters* decision changed the law to require that a seniority system be analyzed separately and invalidated only if maintained with discriminatory intent, does not retroactively dictate that the district court abused its discretion in initially determining that the named plaintiffs' claim was typical of and involved questions of law and fact common to the class members' claims. *Cf. Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir.) ("To determine [in evaluating commonality] what legal claims plaintiffs allege, a judge must look not to defendant's interrogatories but to plaintiffs' complaint."), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed. 2d 250 (1986). Nor did this fact require the district court to decertify the class on Pullman's motion. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d at 1557 ("Rule 23 does not require that all the questions of law and fact raised by the dispute be common"); *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) ("The similarity of the legal theories shared by the plaintiffs and the class at large is so strong as to override whatever factual differences might exist"). The same injury—being locked into Pullman's lower-paying jobs— was under attack by both the named plaintiffs and the class members, and the only real question was whether it was the discrimination in assignments or the nature of the seniority system, or both, that prevented blacks from moving up the job ladder.

The identity of the named plaintiffs' and class members' injuries, especially in light of the way the practices challenged were interrelated, was enough to satisfy the second *Falcon* exception. It indicated that there was a "general policy of discrimination ... [that] *manifested itself* in hiring and promotion practices *in the same general fashion.*" *Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15 (emphasis added).

## C. The Date on Which Discriminatory Assignments Ceased

The plaintiffs argue that the district court erred in determining that Pullman no longer discriminated in assigning new hires after February 1969. The plaintiffs complain about what they deem the district court's vacillation on the issue: in *Swint I*, the court found that blacks had been kept out of some departments and relegated to others until as late as 1972; in *Swint III*, the court found that all discrimination in assignments ended by December 1966; and in *Swint IX*, the court found that the discrimination in assignments ended by February 1969. In the plaintiffs' view, it is not possible to find that certain departments included no blacks or no whites through 1971 and nonetheless conclude that discrimination ended in 1969. The plaintiffs also complain that Pullman's expert, on whom the district court expressly relied in *Swint IX*, used a cumulative figure for the 1969– 1974 period and consequently admitted that he could not pinpoint the date on which discrimination in assignments ended. Finally, the plaintiffs contend that the district court relied too heavily on the 1969 OFCC agreement and conspicuously changed its opinion of the agreement between its decisions in *Swint I* and *Swint IX*.

We do not find the plaintiffs' arguments sufficient to disturb the district court's finding of fact with respect to the date on which Pullman stopped discriminating in assignments. The plaintiffs' contention that the district court's *Swint I* decision that discrimination continued until 1972 should be regarded as the law of the case is incorrect. As this court pointed out

in *Robinson v. Parrish*, 720 F.2d at 1548, a district court need not rigidly adhere to its own rulings in an earlier stage of the case. *Id.* at 1550. To require that the district courts do so "would actually thwart the purpose of the [law of the case] doctrine" because it would prevent them from correcting errors that would otherwise warrant reversal on appeal and necessitate an entirely new trial. *Id.*

■ Although finding it of considerable force, we must also reject the plaintiffs' argument that the district court was substantively in error. In *Swint VII*, the Supreme Court made quite clear that the issue of discriminatory intent is a pure question of fact, subject, under Fed.R.Civ.P. 52(a), to review only for clear error. *Swint VII*, 456 U.S. at 287–88, 102 S.Ct. at 1789. Although a district court's finding of discrimination may be set aside if it rests on "an erroneous view of the law," *id.* at 287, 102 S.Ct. at 1789, it may not be set aside simply because the appellate court would decide the case differently on the same set of facts. *Id.* at 292, 102 S.Ct. at 1792. Because there was some evidence to support the district court's conclusion on the date discrimination in assignments ceased, and nothing in the opinion reflects an erroneous view of the law, the February 1969 date must stand.

It is true that five of Pullman's twenty-eight departments remained all white or all black after February 1969.[38] Were this the only evidence, the inference of discrimination would be very strong. We do not believe, however, that these numbers per se required the district court to find intentional discrimination. There was expert testimony that there was a significant difference between the assignment patterns of the 1964–1969 and 1969–1974 periods, and although segregated departments were not completely eliminated by February 1969, four of the original nine segregated departments were integrated between 1965 and 1969. There was also evidence pertaining to the changes instituted by the January 1969 OFCC agreement: Pullman hired a black equal employment officer and began to encourage black employees to take advantage of company-financed vocational training. The district court was entitled to evaluate all of this evidence and assign certain items more weight than others.

In this connection, it makes no difference that Pullman's expert used cumulative data and admitted that he could not determine from the data the date on which assignments were no longer discriminatory. Unless flaws in statistical evidence are so egregious as to completely deprive the evidence of relevance, they go to the evidence's probative value, not to its admissibility. *Bazemore v. Friday*, 478 U.S. 385, 400, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986). The cumulative nature of the evidence here may have rendered it of less value, but it cannot be said to have deprived it of all value. The evidence still served to show the direction in which assignments at the Bessemer plant were moving, and it could not have misled the district court precisely because of the very admission about which the plaintiffs complain: Pullman's expert was candid enough to admit that a particular ending date could not be pinpointed. Finally, the plaintiffs overstate the district court's reliance on the data. The court's opinion merely recites the conclusions of Pullman's expert, as well as the results of the court's own statistical model, and there is nothing to indicate that the court drew more than a generalized inference concerning the date from Pullman's data.[39]

Indeed, it seems rather clear to us—from its choice of *February* 1969—that the dis-

---

**38.** USW's Air Brake and Inspection Departments remained all white until approximately 1971 and IAM's Die & Tool and Maintenance Departments remained all white until 1970. *See Swint I*, 11 F.E.P. at 953; *Swint VI*, 624 F.2d at 529. Conversely, no whites were assigned to USW's Die & Tool Department until 1971. *Swint I*, 11 F.E.P. at 953.

**39.** The court wrote:

The statistical evidence was generally divided into two time periods—1964 to 1969 and 1969 to 1974. As might be expected, the defendants' and plaintiffs' experts took different statistical approaches and arrived at somewhat conflicting conclusions. The court carefully studied the evidence presented by the parties and at trial presented to the parties for their comment another standard statistical model. Plaintiffs' expert acknowledged that a

trict court was most impressed with the January 1969 OFCC agreement and the testimony with regard to the changes the agreement wrought. We might not have been equally impressed, but we cannot say that the court was clearly erroneous for relying on the agreement. The plaintiffs' emphasis on the court's change in terminology respecting the agreement—stating in *Swint I* that the agreement "never became effective," 11 F.E.P. at 953 n. 32, and in *Swint IX* that it "was never termed official," slip op. at 13 n. 35—is misplaced. Even assuming that there is a meaningful difference between the two phrases, which we very much doubt, both descriptions are based on the idea that the *union* did not accept the agreement, and in measuring Pullman's intent, the union's position is essentially irrelevant. The court could have concluded, based on the evidence, that the agreement and the programs put in place after its adoption by the company signalled Pullman's intent to change its discriminatory ways.

As should be clear, we affirm the district court's holdings with respect to Pullman's liability for discriminatory departmental assignments. Louis Swint has Rule 23 standing to continue his representation of the class on the issue, and Pullman is liable for classwide discrimination in assignments dating from October 19, 1965 through January 31, 1969.

## V. The Nontransferable Seniority System

The plaintiffs appeal from the district court's decision that the nontransferable seniority system under which Pullman and USW operated in awarding promotions was a bona fide seniority system protected by section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) (1982). They argue that the district court erred in three respects: (1) in refusing to consider whether IAM's arguably racist motives and membership practices so tainted the system that Pullman cannot claim it was bona fide, even if USW can, (2) in failing to consider evidence that in 1965, after it appeared that all jobs at the plant would have to be opened to persons of all races, Pullman abandoned its earlier practice of offering on-the-job training in welding,[40] and (3) in excluding the testimony of over twenty black employees that Pullman discriminated in its job assignments *within* departments. Although, again, we might have weighed the evidence differently, we are unable to find that the district court's validation of the seniority system was clearly erroneous.[41]

In evaluating the seniority system, our primary guide is *International Brotherhood of Teamsters v. United States*, 431 U.S. at 324, 97 S.Ct. at 1843, 52 L.Ed.2d at 396. In *Teamsters*, the Supreme Court held that, in light of section 703(h),[42] a seniority system of promotions cannot be invalidated solely on the basis that it perpetuates pre-Title VII discrimination. *See id.* at 353–54, 97 S.Ct. at 1864. The *Teamsters* Court also indicated that a seniority system cannot be invalidated solely because it perpetuates *post*-Title VII discrimination. Relying on the Court's concurrent

---

considerable change had taken place in the job class distribution by 1969. Defendants' expert found a statistical difference between the pre–1969 and post–1969 periods, with a rough parity between the races in terms of job class assignments from 1969 forward. The alternative study prepared by the court indicated that post–1969 assignments were not racially tainted.
*Swint IX,* slip op. at 12–13.

**40.** A Pullman official admitted that the practice changed because white welders at the Bessemer plant were unwilling to train black employees.

**41.** In *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1191 n. 37 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), this court held that the immunity

created by section 703(h) extends not only to Title VII claims but to section 1981 claims as well. For that reason, the analysis that follows will not focus on the statute on which the plaintiffs base their challenge.

**42.** Section 703(h) provides, in relevant part, that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin." 42 U.S. C. § 2000e–2(h) (1982).

decision in *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), Justice Stewart wrote:

> The legality of the seniority system insofar as it perpetuates post-Act discrimination nonetheless remains at issue in this case, in light of the injunction entered against the union.... Our decision today in *United Air Lines v. Evans*, ... is largely dispositive of this issue. *Evans* holds that the operation of a seniority system is not unlawful under Title VII even though it perpetuates post-Act discrimination that has not been the subject of a timely charge by the discriminatee. Here, of course, the Government has sued to remedy the post-Act discrimination directly, and there is no claim that any relief would be time-barred. But this is simply *an additional reason not to hold the seniority system unlawful,* [43] since such a holding would in no way enlarge the relief to be awarded.

431 U.S. at 348 n. 30, 97 S.Ct. at 1861 n. 30 (footnote added) (emphasis added) (citations omitted).

As this passage demonstrates, the Court has drawn a definite distinction between challenges to a seniority system and challenges to other discriminatory conduct that in turn manipulates the system to the detriment of black employees. *See also Franks v. Bowman Transportation Co.*, 424 U.S. 747, 758, 96 S.Ct. 1251, 1257, 47 L.Ed.2d 444 (1975) ("The underlying legal wrong affecting [the class] is not the alleged operation of a racially discriminatory seniority system but of a racially discriminatory hiring system."). For a plaintiff to prevail in a challenge to a seniority system, there must be a finding that the *system itself* was negotiated or maintained with an actual intent to discriminate.[44] *See Teamsters*, 431 U.S. at 356, 97 S.Ct. at 1865; *see also Swint VII*, 456 U.S. at 289, 102 S.Ct. at 1790. Just as in an ordinary disparate treatment case, the burden of persuading the district court that a system is the product of an employer's discriminatory intent lies with the plaintiff. *Cf. Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 82, 97 S.Ct. at 2276 ("[section] 703(h) unequivocally mandates that there is no statutory violation in the absence of a showing of a discriminatory purpose"); *Harris v. Plastics Manufacturing Co.*, 617 F.2d 438, 440 (5th Cir.1980) ("There was no testimony indicating that the seniority system was instituted or maintained for racially discriminatory reasons."); *Fisher v. Proctor & Gamble Manufacturing Co.*, 613 F.2d at 542 ("there is no evidence in the record to show that the seniority system had 'its genesis in racial discrimination' or that it was negotiated and maintained for any 'illegal purpose' "). Insofar as the decision on the bona fides of a system turns on whether it was negotiated or maintained with discriminatory intent, it is a question of fact subject to review by this court only for clear error. *Swint VII*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91.

The district court's treatment of Pullman's relationship with IAM was not clear error. The plaintiffs appear to be arguing a syllogism of sorts: (1) no one can seriously question that IAM supported the concepts of departments in general and nontransferable seniority in order to keep its local all white; (2) Pullman entered into a collective bargaining agreement incorporating IAM's nontransferable seniority provisions; therefore, (3) Pullman adopted IAM's discriminatory motive. The problem with this argument is that the conclusion does not necessarily follow from the minor premise. Without independent evidence of Pullman's intent with respect to the seniority system, the plaintiffs are essentially

---

**43.** Because *Evans* dealt only with a situation where the employer's separate discriminatory acts in manipulation of the seniority system had not been the subject of a timely EEOC charge, we might not have read the opinion as covering situations where separate discriminatory acts *are* independently and properly in a case. The *Teamsters* passage, however, appears to equate the two situations.

**44.** Evidence that the seniority system has been manipulated can certainly be considered in evaluating an employer's intent with respect to the creation or maintenance of a seniority system, *Evans*, 431 U.S. at 558, 97 S.Ct. at 1889, but a system cannot be invalidated on such evidence standing alone. *Id.* at 560, 97 S.Ct. at 1890.

urging us to impute IAM's motive to Pullman. In *Swint VII*, however, the Supreme Court expressly prohibited us from doing so:

> IAM's discriminatory motivation, if it existed, cannot be imputed to USW. It is relevant only to the extent that it may shed some light on the purpose of USW or the Company in creating and maintaining the separate seniority system at issue in these cases. A discriminatory intent on the part of IAM, therefore, does not control the outcome of these cases. Neither does the fact, if true, that USW acquiesced in racially discriminatory conduct on the part of IAM. Such acquiescence is not the equivalent of a discriminatory purpose on the part of USW.

456 U.S. at 292, 102 S.Ct. at 1792.

■ By recognizing that the plaintiffs' argument is in essence one of presumption, we are not ignoring the plaintiffs' insistence that there was some independent evidence confirming Pullman's discriminatory intent. As noted above, the plaintiffs do cite evidence that Pullman did not assign any blacks to the IAM departments until 1970 and discontinued its practice of on-the-job training once the courts began requiring that all jobs at the plant be made available to black employees. Still, none of this evidence goes directly to Pullman's intent regarding the *system*. It tends to prove instead that Pullman engaged in a number of other, separate discriminatory practices, and, as noted above, the Supreme Court has required us to keep such distinctions in mind.

In short, we cannot say that the district court attributed insufficient significance to the plaintiffs' circumstantial evidence in the face of considerable direct evidence that the system was not the product of discriminatory intent. The district court carefully analyzed the evidence presented, paying special attention to the four factors this court emphasized in *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 352 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978): whether the system operates in a neutral fashion, discouraging all employees equally from transferring between departments; whether the system of seniority units is rational and in accord with industry practice; whether the system had its genesis in racial discrimination; and whether the system was negotiated and maintained free from any illegal purpose. The evidence revealed that whites as well as blacks often desired to transfer but were disinclined to do so because they too would lose their seniority. The evidence also showed that systems including nontransferable seniority between given units are quite common not only with manufacturers generally but with manufacturers of railroad cars.[45] Finally, although there was considerable evidence that the system was adopted at a time when Pullman was openly discriminatory in other respects—i.e., the system did have its "genesis" in racial discrimination—there was nothing to suggest that

---

**45.** The plaintiffs argue that the law of the case doctrine prevented the district court from deciding that the nontransferable seniority system was rational. They cite this court's holding in *Swint VI*, 624 F.2d at 531, that there was no explanation for the segregated departments other than racial discrimination. They then point out that the union asked the Supreme Court on review of *Swint VI* to hold expressly that the departmental seniority system was rational, but the Court declined to do so. This sequence of events, the plaintiffs argue, left in place *Swint VI*'s holding that the system was irrational.

The plaintiffs' argument is without merit. The *Swint VI* holding with respect to the rationality of the system was one of the two with which the Supreme Court most found fault. In discussing how this court had not properly applied Rule 52(a), Justice White wrote:

> In particular, in regard to the second *James* factor—whether the departmental structure was rational or in line with industry practice—the Court of Appeals did not focus on the evidentiary basis for any particular finding of the District Court. It appeared to make an independent examination of the record and arrive at its own conclusion contrary to that of the District Court.

*Swint VII*, 456 U.S. at 291 n. 21, 102 S.Ct. at 1791 n. 21. This indicates rather clearly that the *Swint VI* holding with respect to the system's rationality did not survive *Swint VII*, and it makes no difference that the Court rejected the union's request to hold the system rational. Indeed, that it is not an appellate court's role to enter fact-findings one way or the other was the Supreme Court's whole point.

Pullman acted with discriminatory intent in negotiating or maintaining nontransferable seniority. Indeed, there was evidence that Pullman would have preferred no seniority or the narrowest seniority possible so that it could have the greatest flexibility in filling vacant positions. There was also evidence that at a meeting of primarily black USW employees, a proposal to merge certain departments was voted down. Under these circumstances, the district court was entitled to accept Pullman's theory that the nontransferable seniority system was a compromise negotiated and maintained without discriminatory intent.[46] Having thus found that three of the four *James* factors went against a finding of discriminatory intent, the court was not clearly erroneous in concluding that the seniority system was bona fide.

 The fact that the district court excluded the plaintiffs' evidence with respect to Pullman's allegedly discriminatory job assignments *within* departments does not change our conclusion. We agree with the plaintiffs that the proffered testimony would have served as circumstantial evidence that the system was maintained with discriminataory intent, but we cannot accept the plaintiffs' failure to introduce the evidence before the 1984 proceedings. The plaintiffs knew, as of 1977 and the *Teamsters* decision, that they would have to prove that the seniority system was intentionally discriminatory, and a post-*Teamsters* trial was held in early 1978 precisely for that purpose. It cannot be said that the plaintiffs simply discovered late in the proceedings that many of their number had

been subjected to intradepartmental discrimination: Spurgeon Seals' November 1966 EEOC charge specifically complained that he had been passed over within his department in spite of his seniority. Additionally, the case was returned to the district court under a limited remand. The district court was instructed "to determine what impact the 'locking-in' of blacks to the least remunerative departments had on discouraging transfer between seniority units, and the significance of the discriminatory motivation of IAM with respect to the institution of USW's seniority system," and to hold any other proceedings that "may be deemed necessary in view of our prior opinion and that of the United States Supreme Court." *Swint VIII*, 692 F.2d at 1031–32. Had it permitted the plaintiffs to embark on a new line of proof, the district court might well have violated the mandate rule. *See International Brotherhood of Boilermakers v. Barber*, 841 F.2d 1067, 1071 (11th Cir.1988). For these reasons, the district court did not abuse its discretion in excluding the testimony of the plaintiffs complaining of intradepartmental discrimination.[47]

In concluding our discussion of the seniority system, one thing should be made clear. By affirming the district court's ruling, and finding it conceivable that there could have been discrimination in initial assignments but not in maintaining the seniority system, we are not denying that the two issues are interrelated. Indeed, it is readily apparent that the discriminatory departmental assignments may have caused

---

**46.** We do not even touch upon much of the evidence USW cites with respect to the negotiation of the seniority system, such as the fact that blacks were represented on the negotiating committee and USW's history as a protector of civil rights, because the plaintiffs have recognized that the district court's finding with respect to USW's intent cannot be found clearly erroneous. *See* Brief for Plaintiffs-Appellants William B. Larkin, Louis Swint, *et al.* at 57.

**47.** Nor did the district court err, as the plaintiffs urge in their brief, in failing to provide a remedy for Pullman's allegedly discriminatory intradepartmental assignments. The intradepartmental assignments were not a natural sub-issue of the plaintiffs' challenge to the seniority sys-

tem, as were the initial departmental assignments we have recognized as a viable independent claim. *See supra* part IVA. And we find no indication whatsoever in the record that the plaintiffs ever made clear that they were asserting intradepartmental assignments as an independent claim. For example, in their 1978 brief to this court, the plaintiffs voiced no complaint that the district court overlooked their claim that intradepartmental assignments were discriminatory. In the face of this *complete* dearth of argument and evidence, the plaintiffs' claim that the references in pretrial orders and the like to "job" assignments prove that they were arguing this all along is simply not persuasive.

the seniority system to have a discriminatory impact on black employees' ability to move up the job ladder. As a result, during the Phase II proceedings, any member of the plaintiff class who suffered actionable discrimination in his initial assignment shall be entitled to a consideration of those jobs within the plant he might have gotten had he not been relegated to an all-black department or, in any event, kept out of the all-white departments. Once this determination has been made, corresponding "make-whole" relief should be awarded.

### VI. The Selection of Supervisors

 Pullman appeals from the district court's ruling that our holding in *Swint VI* that the company had discriminated in its selection of supervisors is the law of the case. Pullman's overall objection consists of several interrelated arguments. First, in the company's view, the *Swint VI* holding does not constitute the required finding of intentional discrimination. Second, the holding must be reconsidered because a number of later cases have changed the applicable law: (1) *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), makes clear that *Swint VI*'s references to the plaintiffs' "prima facie case" and the defendant's "rebuttal" were inappropriate; (2) *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), indicates that the plaintiffs' case was erroneously based on statistics that did not account for the qualifications required of Pullman supervisors; and (3) *Swint VII*, although dealing exclusively with the seniority system, reflects the Supreme Court's view that *Swint VI*, as a whole, was an improper exercise of appellate fact-finding. Third, the *Swint VI* holding cannot be the law of the case because this court relied in part on its concurrent holding that the seniority system at Pullman was not bona fide but intentionally discriminatory, a holding the Supreme Court overturned. We reject these arguments and affirm the district court's ruling.

We must acknowledge from the outset that if they were substantively correct, Pullman's arguments might warrant a holding that the decision in *Swint VI* does not constitute the law of the case. Although the law of the case doctrine does dictate that a district court is bound by findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case, *Robinson*, 690 F.2d at 872, the doctrine does not apply to issues that were not actually decided, either explicitly or implicitly. *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir.1984) ("the doctrine encompasses only those issues previously determined"); *Signal Oil & Gas Co.*, 654 F.2d at 1169 ("law of the case does not operate to bar subsequent consideration of matters that could have been, but were not, raised and resolved in the earlier proceeding"). Pullman's first argument, that the *Swint VI* treatment of the supervisors issue was not the requisite finding of intentional discrimination, is in essence a contention that *Swint VI* did not actually decide the supervisors issue. Likewise, Pullman's second argument, that Supreme Court cases decided after *Swint VI* require that the decision be reconsidered, appears to invoke a well-established exception to the law of the case doctrine. The doctrine does not bar reconsideration of a legal conclusion when controlling authority has since made a contrary decision of applicable law. *Wheeler*, 746 F.2d at 1440; *EEOC v. International Longshoremen's Ass'n*, 623 F.2d 1054, 1058 (5th Cir.1980), *cert. denied*, 451 U.S. 917, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981). Finally, Pullman's third argument, that *Swint VI* must be reconsidered because an aspect of the case on which this court relied was overturned by the Supreme Court, implicates yet another exception to the doctrine. A prior appellate decision may be disregarded if it was clearly erroneous and would work a manifest injustice. *Wheeler*, 746 F.2d at 1440; *United States v. McClain*, 593 F.2d 658, 664 (5th Cir.), *cert. denied*, 444 U.S. 918, 100 S.Ct. 234, 62 L.Ed.2d 173 (1979). We are unable to conclude, however, that Pullman's arguments are meritorious in substance.

It is true, for example, that *Swint VI* does not include a finding that Pullman intentionally discriminated in its selection of supervisors. That observation, however, is irrelevant: the plaintiffs here clearly proceeded on a disparate impact, rather than disparate treatment, theory and thus did not need to prove discriminatory intent. *See Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–32, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971); *see also Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15 (discussing the distinction between disparate treatment and disparate impact cases). They were required, as an initial matter, to show only that a facially neutral practice was operating to exclude blacks from the supervisory positions in a significantly disproportionate fashion. *See Teal,* 457 U.S. at 446, 102 S.Ct. at 2530; *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977). The burden—not just of production but of persuasion—was then on Pullman to show that the practice challenged arose from a non-discriminatory business necessity. *See id.* at 329, 97 S.Ct. at 2727; *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854. The *Swint VI* court found simply that while the plaintiffs had met their burden, Pullman had offered no legally acceptable evidence that its subjective selection procedure was a business necessity. The district court's decision that Pullman was liable was properly based on this conclusion of law.

Pullman similarly confuses disparate treatment and disparate impact cases by arguing that *United Postal Service v. Aikens* requires a reconsideration of the *Swint VI* holding. *Aikens* did hold, as Pullman notes, that once a case is fully tried, the concepts of plaintiffs' "prima facie case" and "rebuttal" should be discarded and the case evaluated to determine solely whether the plaintiffs proved intentional discrimination, 460 U.S. at 711, 715, 103 S.Ct. at 1482, and, as noted above, the *Swint VI* court did use the prima facie case and rebuttal terminology. *Aikens,* however, was a disparate treatment case requiring a showing of discriminatory intent, and its result was inextricably related to the Court's earlier attempts to make discriminatory intent susceptible of proof. The prima facie case-rebuttal-pretext framework for disparate treatment cases was developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), precisely because the Court realized that it would seldom be possible for plaintiffs to prove intentional discrimination directly and wanted to establish a series of shifting presumptions to ease that otherwise impossible burden. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981); *see also Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). *Aikens* is thus wholly inapplicable to this disparate impact case,[48] where proof of discriminatory intent has never been necessary, and does not require that *Swint VI* be overturned simply because the opinion employed "prima facie case" and "rebuttal" terminology. Indeed, when one considers that a disparate-impact defendant actually carries a responsive burden of *persuasion,* unlike the rebuttal burden of *production* borne by the disparate-treatment defendant, it seems clear that the *Swint VI* court's references

---

**48.** Apparently anticipating that the plaintiffs, and perhaps this court, would distinguish *Aikens* as a disparate treatment case, Pullman argues that *Bazemore v. Friday,* 478 U.S. at 978, 106 S.Ct. at 3000, indicates that *Aikens'* holding is not limited to disparate treatment cases. *Bazemore,* however, was a "pattern and practice" case requiring the plaintiffs to " 'establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather the unusual practice.' " *Id.* at 3008 (quoting *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855). Because this burden is so similar to that imposed on the plaintiffs—and only on the plaintiffs—in a disparate treatment case, we do not believe *Bazemore* sufficiently akin to a disparate impact case to warrant any further extension of *Aikens.* We are especially comfortable with this conclusion having noted now-Chief Justice Rehnquist's opening footnote in *Aikens:* "We have consistently distinguished disparate-treatment cases from cases involving facially neutral employment standards that have disparate impact on minority applicants." 460 U.S. at 713 n. 1, 103 S.Ct. at 1481 n. 1.

were, in a sense, misnomers intended to represent the parties' respective burdens.

We must also reject Pullman's argument that *Johnson v. Transportation Agency* reflects a change in the applicable law requiring us to reconsider and presumably overturn *Swint VI*. *Johnson* addressed the proof necessary to establish that a "manifest imbalance" in an employer's previous hiring or promotional policies justified its giving preference to women or minorities. In the course of its discussion, the Court noted that any statistics offered to prove such an imbalance must compare those actually hired or promoted with "those in the labor force who possess the relevant qualifications." 480 U.S. at ——, 107 S.Ct. at 1452. The Court also indicated that a plaintiff attempting to make out a prima facie case under Title VII is subject to the same requirement: "In order to make out a prima facie case on [a Title VII] claim, a plaintiff would be required to compare the percentage of black skilled workers in the ... work force with the percentage of black skilled craft workers in the area labor market." *Johnson*, 480 U.S. at —— n. 10, 107 S.Ct. at 1452 n. 10 (employing the facts from *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), in a hypothetical). Pullman argues from this observation that the plaintiffs here failed to show that there were any *qualified* blacks denied supervisory positions.

In our view, Pullman overstates the holding of *Johnson*. *Johnson*, and *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), upon which the *Johnson* Court relied, represent the Court's efforts to ensure that a Title VII plaintiff's statistical evidence is sufficiently narrow to raise a legitimate inference of discrimination. In other words, the cases set forth a relevance threshold that plaintiffs must satisfy if their case is to proceed further. Here, the plaintiffs compared the percentage of blacks in the Pullman workforce, all of whom were theoretically eligible for positions at least as temporary supervisors, with the percentage of blacks who were actually selected. There was no application process for the supervisory positions, so it was not possible for the plaintiffs to compare the percentage actually selected with the percentage of applicants. Additionally, even when, in the early stages of the proceeding, Pullman was under what it would now deem the mistaken impression that it was the party responsible for identifying the qualifications necessary to become a supervisor, it put forth only generalized criteria [49]—ability to get along with other employees, knowledge of particular departments, and experience as a temporary foreman—that either would be impossible to incorporate into statistical proof or were themselves the result of discrimination.

Put simply, the plaintiffs used the narrowest statistics available, and we will not fault them for failing to account for "qualifications" that Pullman has, to this day, been unable to definitively articulate. To hold otherwise would be to read *Johnson* and *Hazelwood* as requiring plaintiffs to identify at the outset every criterion employed in a *subjective* selection process, a

---

49. In its *Swint III* ruling that Pullman had not discriminated in the selection of supervisors, its last discussion of this issue, the district court did not specify a single "skill" that was needed to perform as a supervisor, despite its conclusion that "[i]t is clear from the evidence, if not from common sense, that special skills are needed by supervisors." 15 F.E.P. at 150. The court did fault the plaintiffs' statistics for failing to account for the higher rate of black illiteracy and for the time blacks would need, due to previous discrimination, to develop "skills useful to supervisors," *id.* at 150 n. 15, whatever those were. Both of these observations, however, were in direct contravention of this court's holding in *Swint II*:

> Since no minimum educational requirement was proven legal under the strict guidelines of Title VII, the 'requirement' may not be used as a generalized inference to explain why blacks were not potential supervisors.
>
> ....
>
> ... The [district court in *Swint I*] concluded that due to pre-'65 segregation of jobs, it has taken blacks some time to learn the range of job skills necessary to perform supervisory duties. This justification for not promoting blacks has been uniformly rejected by this court.

539 F.2d at 104.

virtually impossible feat and one this court rejected in *Griffin v. Carlin,* 755 F.2d at 1528.[50] We do not believe that the Supreme Court intended such a radical result even in disparate treatment cases, much less in disparate impact cases. We are convinced that if the Court had intended to reassign the burden of production to Title VII plaintiffs, it would have said so. Pullman's final two contentions are based on the Supreme Court's holding in *Swint VII.* The company first argues that even if the Court did not directly review the *Swint VI* holding on the selection of supervisors, its opinion makes clear that all of *Swint VI* should be disregarded as improper fact-finding. For two reasons, we find this contention insufficient to require that the supervisors issue be reopened.

First, we are not free to reexamine an issue that has been finally decided and as to which certiorari has been denied unless there has been a clear change in the applicable law or our prior decision is found "manifestly erroneous." The holding in *Swint VII* presents neither of these situations. *Swint VII* did not *change* the law; it held simply that this court had not properly applied the clear error standard of Rule 52(a) to the seniority system issue. There was no suggestion in *Swint VII* that this court's treatment of the supervisors issue suffered from the same infirmity.

Second, even if it were appropriate to take a second look at *Swint VI*'s treatment of the issue, we would hold that Rule 52(a) was properly applied. Rule 52(a) requires us to refrain from reweighing evidence, but it does not prohibit us from correcting a district court's legal errors. *See Swint VII,* 456 U.S. At 291–92, 102 S.Ct. at 1791–92. *Swint VI*'s reversal of the district court on the supervisors issue more readily falls into this latter category. The court held that the district court had erred because (1) Pullman had not put forth "any evidence sufficient to show that the limitation upon which the defendant's business necessity defense rests is essential to the safety and efficiency of [its] operations," and (2) Pullman's rebuttal evidence—the slightly higher rate at which blacks refused promotions to supervisor and the pressure from other black employees that black supervisors suffered—could not be relied upon because the circumstances cited themselves resulted from the history of discriminatory practices at the Bessemer plant.[51] *Swint VI,* 624 F.2d at 536.

Both of these grounds reflect legal principles well established in this circuit. *See, e.g., Giles v. Ireland,* 742 F.2d 1366, 1381 (11th Cir.1984) (judgment for defendant vacated where there was no showing that challenged policy was related to job performance); *Watkins v. Scott Paper Co.,* 530 F.2d 1159, 1192–93 (5th Cir.) (experience requirement could not justify disparate impact where "[p]ast discriminatory practices have either prevented or discouraged many of [defendant's] employees from transferring to many lines of progression and from gaining the experience [the defendant] deems necessary in a supervisor"), *cert. denied,* 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976); *Stevenson v. International Paper Co.,* 516 F.2d 103,

**50.** We must emphasize that our holding is one of degree. We recognize fully that *Johnson* and *Hazelwood* require plaintiffs to recognize the basic qualifications for a position and exclude from their statistical pools persons who are obviously unqualified. We simply do not believe that plaintiffs are responsible for reading their employers' minds and culling out those persons who do not meet narrow, employer-specific "qualifications." Indeed, it is often those very qualifications that are causing a discriminatory impact; they should be subjected to the light of day and evaluated to see if they are truly necessary to the employer's business.

**51.** In some circumstances, this might be considered a fact-finding in itself, but the district court essentially acknowledged that the black rejection rate was connected to the racial atmosphere at the plant. When the court decided to focus in *Swint III* on the rejection rate of 1971–1973, the court wrote: "Prior to 1971 the turndown rate by blacks was higher, and subsequent to 1972 the rate was probably lower. The 1971–73 figures should be [sic] reasonable approximation for the period as a whole." 15 F.E.P. at 152 n. 21. It is hard to imagine why the district court would be willing to speculate that blacks became more and more likely to accept foreman positions unless it had concluded that the rejection rate and the discriminatory practices at Pullman were related.

117 (5th Cir.1975) (lack of experience in a particular line of progression does not justify disparity in appointments to supervisor where blacks were excluded from those lines of progression). Once the court addressed these legal errors, it was left only with the plaintiffs' showing that a remarkable disparity existed in the selection of supervisors.[52] Because this in turn left only one resolution of the issue, the court reversed. *See Swint VII,* 456 U.S. at 292, 102 S.Ct. at 1792 ("where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue"). We are thus unable to conclude that *Swint VI* was manifestly erroneous, and the district court properly regarded its holding on the supervisor issue as the law of the case.

That *Swint VII* reversed the court's holding on the seniority system does not change this conclusion. It is true that the court in *Swint VI* referred to the fact that "black employees were locked in the lower paying jobs and departments." 624 F.2d at 536. The context in which this reference was made, however, was in explaining why blacks had become sufficiently demoralized that they might refuse to serve as supervisors. The lock-in effect was not cited as affirmative evidence that Pullman's entirely subjective selection procedure had a disparate impact on black employees. Moreover, *Swint VII* did not reject the idea that blacks were locked into the lower paying jobs. It merely held, as we do today, that the seniority system *itself* was not intentionally discriminatory. Under these circumstances, we do not believe the reference to the lock-in effect—which, due to the discriminatory post-Act departmental assignments, was no doubt a reality at Pullman—renders the *Swint VI* holding on the selection of supervisors manifestly erroneous.

We affirm the district court's decision that Pullman's subjective procedures for selecting supervisors violated Title VII.

## VII. The *Larkin* Appeal

The *Larkin* plaintiffs appeal from the district court's denial of their motion under Fed.R.Civ.P. 60(b)(6) to transform its dismissal with prejudice to a dismissal without prejudice. The plaintiffs argue that the *Larkin* court should have essentially reopened their case once it became apparent that the *Swint* court would not hold Pullman liable for any discrimination prior to July 17, 1969 and would not hear any evidence concerning discriminatory intradepartmental assignments. These rulings by the *Swint* court, the plaintiffs contend, render erroneous the *Larkin* court's 1976 decision that the *Larkin* plaintiffs were barred by res judicata.

We affirm the *Larkin* court's denial of the Rule 60(b)(6) motion. With respect to the liability period, our decision that Pullman should be held liable from October 19, 1965 for its discriminatory assignments of new hires, *see supra* part III.B, eliminates the *Larkin* plaintiffs' concern that two years of discrimination against them will not be addressed. With respect to the issue of intradepartmental assignments, our ruling that the district court did not abuse its discretion in excluding that evidence, *see supra* part V, must be applied to the *Larkin* plaintiffs just as it is to those in *Swint.* The *Larkin* court dismissed the *Larkin* plaintiffs' case in 1976. From then until 1984, when they moved the court to reconsider their case, the *Larkin* plaintiffs were operating on the assumption that they were members of the *Swint* class. Yet at no time during that seven-year period did the *Swint* plaintiffs ever attempt to put on evidence, which presumably could have come straight from the *Larkin* plaintiffs, that Pullman was continuing its pre–1965, "white job"-"black job" practice of discrimi-

---

**52.** The court noted that in a workforce ranging from 45% to 50% black, and out of 143 salaried foremen positions, there was not a single black salaried foreman until 1966. In 1970, out of 160 salaried positions, blacks held nine. Through the time of trial in 1974, there had never been a black foreman, temporary or salaried, in thirteen of Pullman's twenty-eight departments. From 1966 through the time of trial, only twelve blacks were selected to fill fifty-nine salaried foreman vacancies. *Swint VI,* 624 F.2d at 527–28.

natory intradepartmental assignments. No meaningful explanation has ever been offered to explain this omission. Under these circumstances, the *Larkin* plaintiffs cannot be heard to complain that their claim concerning intradepartmental promotions was unjustly eliminated. In short, it was not the *court* in *Larkin* that was under a mistaken impression; it was the plaintiffs, to the extent that they believed that the *Swint* plaintiffs would properly raise their claim.

## VIII. Conclusion

The district court's judgment in *Larkin v. Pullman-Standard*, No. 84–7319, is affirmed. The court properly denied the *Larkin* plaintiffs' motion to amend or alter the judgment.

The district court's judgment in the appeal by Pullman Standard, *Swint v. Pullman-Standard*, No. 87–7057, is affirmed. The plaintiffs proved that the subjective procedures for selecting supervisory personnel had a discriminatory impact on Pullman's black employees, and the district court did not abuse its discretion in ruling that Louis Swint and Willie Johnson had Rule 23 standing to represent the class on the departmental assignments claim.

The district court's judgment in the appeal on behalf of the *Swint* plaintiffs, *Swint v. Pullman-Standard*, No. 86–7886, is affirmed in part and reversed in part. The district court did not err in finding that the seniority system was not created or maintained with discriminatory intent or in finding that any discrimination in departmental assignments ended by February 1969. The district court did err, however, in determining that Pullman could not be liable for any discrimination occurring before July 17, 1969. Pullman should be held liable for any discrimination in departmental assignments, the plaintiffs' section 1981 claim, from October 19, 1965 until January 31, 1969, and for the discriminatory impact of the supervisory selection procedures, the plaintiffs' Title VII claim, from September 28, 1966 until August 16, 1974.

Accordingly, we remand No. 86–7886 to the district court for further proceedings consistent with this opinion. Phase II proceedings should be held to determine the relief due the plaintiffs on their departmental assignment and selection of supervisors claims.

AFFIRMED in part, REVERSED in part and REMANDED.